Craig L. HINES, Plaintiff,

v.

ADAIR COUNTY PUBLIC HOSPITAL DISTRICT CORP., d/b/a Westlake Cumberland Hospital; T.J. Samson Hospital; Jesus Siady, M.D.; Taylor County Hospital District Health Facilities Corp.; Nasseem Rauf, M.D.; Hugh Barret A. Lessenberry, M.D.; Reddy & Lessenberry, P.S.C., Defendants.

Civ. A. No. C92–0068–BG(H).

United States District Court,
W.D. Kentucky,
at Bowling Green.

July 20, 1993.

Thomas A. Wiseman, III, C.J. Gideon, Gideon & Wiseman, Nashville, TN, for plaintiff.

H. Jefferson Herbert, Jr., Herbert & Herbert, Glasgow, KY, for T.J. Samson Community Hosp.

Gregory J. Bubalo, Ogden, Newell & Welch, Louisville, KY, for Jesus Siady, M.D.

Joe Bill Campbell, Lanna Martin Kilgore, Campbell, Kerrick & Grise, Bowling Green, KY, Donald K. Brown, Jr., O'Bryan, Brown & Toner, Louisville, KY, for Nasseem Thomas Rauf, M.D.

Donald W. Darby, Jacobson, Maynard, Tuschman & Kalur, Louisville, KY, for Hugh Barret A. Lessenberry, M.D. and Reddy & Lessenberry, P.S.C.

John David Cole, Cole, Moore & McCracken, Bowling Green, KY, for Adair County Public Hosp. Dist. Corp.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This case arises under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which requires hospital emergency departments to treat all individuals who arrive for treatment having an emergency medical condition. Where common law once imposed no duty to treat, this new federal duty proscribes what is commonly called "patient dumping," a phenomenon exacerbated by increasing economic pressures upon for-profit hospitals. Although the plights of the indigent and uninsured, not to mention public hospitals who ultimately bear the brunt of patient dumping, clearly prompted this legislation,[1] the Sixth

---

1. For example, the Cooke County Study, which classified those patients transferred to public

Circuit has interpreted its sweeping language to proscribe the discriminatory failure to treat *paying* patients upon the basis of sex, race, national origin, politics, or social status, among others. *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990). The pending motions to dismiss for failure to state a claim and for summary judgment call upon the Court to apply this evolving federal duty.

Plaintiff, Craig L. Hines, sustained a serious blunt trauma injury to the knee in an automobile accident in the predawn hours of May 19, 1991. Within forty-eight hours of the accident, Plaintiff received treatment from three physicians of three different hospitals, all who failed to diagnose an injury to the popliteal artery behind the left knee. Despite continuing visits with one of those physicians presumably for torn ligaments requiring a long-leg splint, Plaintiff ultimately came under the care of a Louisville physician who amputated Plaintiff's left leg above the knee due to ischemia, a complication arising from the original injury.

█ Those health care providers initially involved with Plaintiff's treatment are Defendants in this action. Plaintiff asserts federal claims against Defendants, Westlake Cumberland Hospital and Taylor County Hospital for failing to provide appropriate medical screening examinations, § 1395dd(a), and for discharging Plaintiff in an unstable condition, § 1395dd(b).[2] Plaintiff joins the other named Defendants in pendent claims, including medical malpractice and theories of vicarious liability.

## I. BACKGROUND

Defendants' motions challenge Plaintiff's federal claims principally on the ground that any alleged failure to comply with § 1395dd did not involve a discriminatory motive, an essential element of Plaintiff's claim as re-quired under *Cleland*. A factual background and the procedural history of this case will show that Plaintiff's hurdle under *Cleland*, although broad, is high and in this case insurmountable despite extended opportunities for discovery on this discrete issue.

### A. Factual History

Emergency medical technicians transported Plaintiff from the accident scene by ambulance to the emergency room of Westlake Cumberland Hospital where triage nurse, Celia Downey, and an internal medicine physician, Dr. Jesus Siady, first examined him at 2:30 a.m., May 19, 1991. At that time, Plaintiff could not move his left leg and complained of extreme pain. Dr. Siady examined Plaintiff and determined that he "possibly" suffered from torn ligaments in the left knee requiring treatment of an orthopedic specialist. (Siady Dep. at 44.) Because Westlake Cumberland Hospital did not have an orthopedist on call, Dr. Siady performed little more than stopgap treatment pending a 9:00 a.m. referral to orthopedist, Dr. Hugh Lessenberry. Whether Dr. Siady negligently failed to rule out a vascular injury, as Plaintiff asserts, is a medical malpractice question. In any event, at 5:15 a.m. Dr. Siady discharged Plaintiff, wearing a knee immobilizer and using crutches, with instructions to follow-up with Dr. Lessenberry.

Plaintiff arrived at T.J. Samson Hospital May 19, 1991 at the appointed time to see Dr. Lessenberry and waited through the morning. Dr. Lessenberry examined Plaintiff, applied a long-leg splint, (described as a "slab cast," Rauf Dep. at 11), and instructed Plaintiff to return in ten to twelve days. Only one day later, on May 20, 1991 at around 5:00 p.m., Plaintiff could not bear the tightness and pain in his leg, so he called Dr. Lessenberry's office complaining that the cast was too tight and that his foot was numb

---

hospitals, revealed that 87% of transferring hospitals cited a lack of insurance coverage as the sole reason for transfer. Karen I. Treiger, Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y.U.L.Rev. 1186 (1986).

**2.** The Defendant physicians also move to dismiss the federal claims. The Court, however, reads the Complaint as stating a federal claim against only the Defendant hospitals. Even if the Complaint were construed to implicate the Defendant physicians under the federal Act, Plaintiff could not legally sustain these claims since, in this Court's view, § 1395dd does not provide a private cause of action against physicians. *Delaney v. Cade*, 986 F.2d 387, 393 (10th Cir.1993); *Baber v. Hospital Corp. of America*, 977 F.2d 872, 876–78 (4th Cir.1992).

and cold. Dr. Lessenberry's office instructed him to go to the emergency room of Taylor County Hospital "to tell them that Dr. Lessenberry sent you, and to tell them to trim it down." (Complaint at 10.)

An ambulance again transported Plaintiff this time to the emergency room of Taylor County Hospital arriving at around 11:00 p.m. The emergency room staff that evening consisted of emergency room physician, Dr. Thomas Rauf, registered nurse, Marian Caldwell, and nursing assistant, Barkley Taylor, who knew Plaintiff and is related as a second cousin. While Plaintiff was in transit, Nurse Caldwell received a report of Plaintiff's initial medical history from the emergency medical technicians indicating that Plaintiff was involved in a motor vehicle accident the night before, was treated and released at Westlake Cumberland Hospital, and complained of leg pain and injury due to "an ace bandage being too tight." (Caldwell Dep. at 27.)

Upon Plaintiff's arrival, Nurse Caldwell recorded that Plaintiff's left foot nail beds were pale, capillary refill was poor, and that Plaintiff's chief complaint was pain, numbness and coldness in his toes of the left foot, and a tight cast. There is contradictory testimony concerning whether Nurse Caldwell or Dr. Rauf felt or palpated a dorsalis pedis pulse or whether there was mottling of the skin or advanced ischemia. Plaintiff emphasizes that a doppler was routinely available and should have been used to attempt to register a pulse, particularly since expert testimony for Plaintiff establishes that "the popliteal artery had already been compromised to the extent no pulse would have been present." (Hasty aff. ¶ 9, Supp.Mem. in Further Resp. by Pla # 40.)

Dr. Rauf testified that Plaintiff complained of a tight cast, that he trimmed it and discharged Plaintiff within a half an hour after his arrival with instructions to follow-up with his doctor. There is a significant factual dispute about whether, according to Plaintiff, his foot remained cold and numb or whether, according to Dr. Rauf, Plaintiff's foot warmed up and the numbness completely subsided. Dr. Rauf maintains that Plaintiff did not complain of pain in the knee and that

there was no concern of arterial occlusion due to transient dislocation of the knee caused by the accident. Dr. Rauf contends instead that intervention in these situations, absent acute symptoms, is limited to trimming a cast and an instruction to follow-up with the actively treating physician.

On May 28, 1991, Plaintiff's mother noticed discoloration in her son's foot. She contacted Dr. Lessenberry's office and requested an appointment. Thereafter, Dr. Lessenberry saw Plaintiff on numerous occasions and later referred him to a physician in Louisville for treatment. Plaintiff underwent two procedures for the amputation of his leg ultimately above the knee. Prompt, adequate treatment of popliteal artery injury can prevent the need to amputate. Either the absence of a dorsalis pedis pulse or merely the continued existence of a cold and numb foot, according to Plaintiff's expert, should have led Dr. Rauf to bi-valve the cast, to examine Plaintiff's leg, to order and if necessary transfer Plaintiff for a stat arteriogram, and to obtain immediate consultation with an orthopedic or vascular surgeon. (Hasty aff. at ¶¶ 10–11.) All three physicians who cared for Plaintiff within forty-eight hours of the accident arguably failed to diagnose Plaintiff's condition.

## B. Procedural History

■ Plaintiff filed this action invoking federal jurisdiction by claiming violations of EMTALA. Several Defendants moved to dismiss the federal claims, which, if successful, would defeat federal venue of the state malpractice claims. After a thorough discussion of the issues with the parties, the Court held in abeyance the motions to dismiss and stayed discovery with one limited exception: the Court allowed the parties sixty days to develop evidence of discriminatory motive as defined by *Cleland v. Bronson*, 917 F.2d 266 (6th Cir.1990). After two extensions of time for discovery spanning an additional four months, the parties have filed six depositions, other discovery and supplemental briefs, and Westlake Cumberland Hospital in the interim moved for summary judgment. Because the Court will consider proof in support of the allegations in the Complaint, the pending

motions to dismiss stand submitted as motions for summary judgment.

## II. REVIEW

■ The facts of this case are disputed at nearly every turn. Defendants' burden, therefore, on the motions for summary judgment is to show that they are entitled to judgment as a matter of law construing the evidence and all reasonable inferences in a light most favorable to Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Plaintiff's evidence, however, must be more than colorable but significantly probative of his claim as if at trial to withstand a motion for a directed verdict. *Id.*

Presuming the truth Plaintiff's allegations the Court must determine whether Plaintiff may recover under EMTALA as a matter of law. In this case, the Court has given Plaintiff ample opportunity and notice as to what the law might require.[3] Therefore, the Court has no hesitation in considering whether the facts of record suggest an improper motive as defined in *Cleland.*

## III. ANALYSIS

### A. Appropriate Medical Screening Examination

■ Section 1395dd imposes two duties upon emergency room departments. The first duty is to provide "an appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a). The Sixth Circuit defined the term "appropriate" as used in subsection (a) as "care similar to care provided to any other patient." *Cleland*, at 271. The difficulty with this concept is that physicians presumably in the ordinary course do not negligently examine patients in order to detect an emergency condition. Malpractice, however, is not necessarily "inappropriate" as that term is defined in *Cleland.* Rather, an inappropriate screening examination is

one that is "deficient in any way peculiar to the patient's characteristics." *Id.* at 269.

■ The Sixth Circuit suggested a broad definition of characteristics that may serve as a basis for inappropriate care, including but not limited to "sex, race, national origin, financial condition, politics, social status." *Id.* at 271. This approach, therefore, "precludes resort to a malpractice or other objective standard of care.... Instead, 'appropriate' must more correctly be interpreted to refer to the motives with which the hospital acts." *Id.* at 272.

### B. Stabilization

■ If the hospital detects an emergency medical condition, the hospital's second duty is to stabilize a known emergency condition prior to transfer or discharge. 42 U.S.C. § 1395dd(b), (c). The Sixth Circuit has ruled that the second duty is, therefore, dependent on the first: the duty to stabilize arises only where a physician, during the course of a screening examination, actually discovers an emergency condition. *Cleland*, at 271. Absent actual knowledge of an emergency condition, there is no duty to stabilize.

■ Just as an improper motive is an essential element of an "inappropriate" screening, a breach of the duty to stabilize similarly requires the presence of a discriminatory motive. *Id.* at 271. In *Cleland*, the court held that the hospital complied with its federal duty to stabilize, although the patient was in fact not stabilized, since "[i]n the hospital's opinion, the patient was stable, and they would have believed that a patient with any differing characteristics would have been stable." *Id.* The Sixth Circuit noted that nothing within the statutory language or legislative history "indicates that Congress intended to provide a guarantee of the result of emergency room treatment and discharge." *Id.* In other words, Congress did not intend to create a federal tort of negligence or to require the application of a negligence standard in an analysis of either of these federal

---

**3.** The Court's Order dated September 30, 1992 limited discovery to proof of Defendants' motives or reason as defined in *Cleland* relating to the federal claims. The scope and interpretation of

this Order came into question during a day of scheduled depositions, whereupon the Court clarified the nature of the proof necessary under *Cleland.* (Caldwell Dep. at 61.)

duties as an alternative to state medical malpractice claims.

## C. Improper Motive

▉ A common thread running through both federal duties is that discriminatory motive is an essential element. The Sixth Circuit did not nor is it necessary to exhaustively define what patient characteristics could serve as a basis of inappropriate screening or stabilization. Clearly, a hospital would violate the Act if it declined treatment on the basis of a patient's inability to pay. At the other end of the continuum, a hospital may violate the Act if it declined treatment on a completely arbitrary basis, for example, the one hundredth patient to seek emergency treatment in one day or the patient that arrives shortly before the end of an emergency room physician's shift.

▉ An interesting point to note is that an arbitrary "improper" motive would implicate federal rights where no state malpractice claim is cognizable, since the spurned patient did not enter a doctor-patient relationship. In this context, federal law works in tandem with state medical malpractice law. Prior to the enactment of EMTALA, most hospitals may have been under no duty to treat individuals (paying, nonpaying, black, white, male, female) seeking emergency treatment. Once federal law imposes simply an affirmative duty to treat, irrespective of good practice or malpractice, patients are bootstrapped into the protections of state laws holding accountable those physicians who negligently carry out their duty to treat.

▉ An objective malpractice standard is distinguishable from even an arbitrary, improper motive, although the existence or nonexistence of malpractice is a red herring under this analysis. Even if there is no malpractice—as in the case where a physician discharges a patient with a known emergency condition, yet the patient immediately and without physical harm receives emergency treatment elsewhere—the court must engage the very same inquiry. If the physician refused to treat due to even the most arbitrary of motives attributable to the plaintiff, the hospital is liable under the Act. Discerning the element of improper motive in the federal duties achieves the objective of the federal statute, that is, to preempt the common law of no duty to treat yet stopping short of creating an analogous federal malpractice cause of action.

## IV. APPLICATION

### A. Westlake Cumberland Hospital

▉ Plaintiff alleges that Westlake Cumberland Hospital breached both federal duties by conducting an inappropriate medical screening examination and by discharging Plaintiff in an unstable condition. The improper motive Plaintiff seeks to establish relates to Plaintiff's insurance coverage. Specifically, Plaintiff alleges that Dr. Siady told Plaintiff and his family members that the hospital was discharging him (with a referral to orthopedist, Dr. Lessenberry) "for insurance purposes." (Complaint ¶¶ 15, 69, 70.) For present purposes, the Court will assume Plaintiff was discharged due to the lack of insurance and in an unstable condition.[4]

---

4. Although Plaintiff claims that the improper "insurance purposes" reason motivated Dr. Siady to discharge him, a strong argument could be made that a reasonable jury could not conclude this necessary element of the claim under EMTALA. The Westlake patient chart prepared during Plaintiff's three hour stay at the hospital clearly indicates that Plaintiff did have insurance acceptable to the hospital. Plaintiff's charges make little sense in view of the fact that Dr. Siady would have undoubtedly had knowledge of the information contained on the patient chart. Furthermore, absent the existence of the predicate fact supporting an improper motive, that is, the actual lack of insurance, the claim of improper motive here arguably has no factual basis whatsoever.

Moreover, Plaintiff must show that he was "unstable" at the time of transfer in order to have a claim under EMTALA. However, the Court finds no evidence whatsoever of a "medical deterioration ... to result from or occur during the transfer." 42 U.S.C. § 1395dd(e)(3)(B). No physician has asserted that the brief four (4) hour interval between Westlake's treatment of Plaintiff and his subsequent treatment at T.J. Samson caused a deterioration of Plaintiff's condition. In truth, Plaintiff does not attempt to argue the failure to stabilize and presents no affidavit or other testimony indicating otherwise.

Plaintiffs claim, then, rises or falls on whether Dr. Siady conducted an appropriate medical screening examination.

Dr. Siady examined Plaintiff's leg, among other complaints, and although Dr. Siady noted that the leg was in alignment, he misjudged the possibility of spontaneous relocation of knee and, thus, failed to diagnose popliteal artery injury. Defendants emphasize that Plaintiff's chart clearly indicates that he had insurance through his employer. For purposes of summary judgment, the Court will assume that Dr. Siady mistakenly thought that Plaintiff had no insurance or that the coverage of his insurance was inadequate.

Although this might explain why Dr. Siady discharged Plaintiff, this does not explain why Dr. Siady failed to detect Plaintiff's vascular injury during the initial screening examination. Even assuming Dr. Siady thought Plaintiff lacked adequate insurance coverage and was unable to pay for a hospital admission or observation, Plaintiff must be able to establish that Dr. Siady conducted an initial screening examination differently than he would have provided any other paying patient. Failure to diagnose in the first place is, doubtless, no way attributable to the insurance motive, although it may be attributable to malpractice. There is no evidence to support a reasonable inference that Dr. Siady would have screened any other patient differently, but for the malpractice.[5] The Court, therefore, holds that Westlake Cumberland Hospital is entitled to summary judgment on the federal claims.

### B. Taylor County Hospital

Plaintiff makes a more determined effort to sustain his claim against Taylor County Hospital. He alleges that Taylor County Hospital conducted an inappropriate medical screening examination and discharged Plaintiff in an unstable condition in breach of both federal duties. For purposes of summary judgment, the Court will assume that Plaintiff did not have even a palpable pulse; that his foot remained cold and numb even after Dr. Rauf trimmed the cast; in short, that Dr. Rauf's testimony is not credible; and that Dr. Rauf discharged Plaintiff with a known emergency medical condition.[6] Viewing the evidence in this light, Plaintiff has a strong medical malpractice claim, but still, Plaintiff must prove that Dr. Rauf's even negligent screening and discharge was improperly motivated in some way by a characteristic peculiar to Plaintiff.[7]

Dr. Rauf stated bluntly in his deposition that he treats patients for their complaints only. Here according to Dr. Rauf, Plaintiff came in the emergency room complaining of a tight cast, and as soon as that was relieved, he discharged him with instructions to follow-up with his actively treating physician. Plaintiff focuses upon these facts as evidence of an improper motive. This raises the issue of whether Dr. Rauf's practice to treat a patient only for referred problems due to the fact that the patient is under the active treatment of another physician constitutes a characteristic peculiar to the patient providing a basis for discriminatory motive as defined under *Cleland*.

5. Even if Dr. Siady had detected Plaintiff's vascular injury, there is no evidence that Westlake had the capability to provide different treatment than it did. Westlake had no orthopedic surgeon or vascular surgeon on call at the time Plaintiff sought emergency treatment. From all the evidence before this Court, between 2:00 A.M. and 5:00 A.M. that morning the Westlake emergency room physician provided "appropriate" medical screening within its capability, which consisted of readying Plaintiff for an appointment with a specialist.

6. Plaintiff appears to have a strong argument that Dr. Rauf did not exercise reasonable professional care in his examination, treatment and discharge of Plaintiff, however, it could be argued that there is no evidence that Plaintiff's condition was unstable and deteriorated during transfer as defined in Section 1395dd(e)(3)(A). It was not until eight (8) days after leaving Dr. Lessenberry's office that Plaintiff's condition either (1) deteriorated sufficiently or (2) became so unstable that he contacted the doctor's office.

7. Plaintiff argues that he need not show a "motive" where the objective proof demonstrates the existence of an emergency condition and discharge in an unstabilized condition. However, Plaintiff's arguments starkly contrast with the mandates of *Cleland* as explained in Section III of this Memorandum Opinion.

Labeling this an improper "motive" as defined by *Cleland* has some superficial appeal. A more rigorous and realistic analysis, however, leads the Court to conclude otherwise. The fact that a patient is under the care of another physician is not a characteristic peculiar to Plaintiff. The fact that a patient comes to the emergency room complaining of only certain things is not a characteristic peculiar to Plaintiff. *Any* patient with a cast who comes to the emergency room obviously has an actively treating physician.[8] *Every* patient who comes to the emergency room has some particular complaint. These are patient qualities which are common to all patients, rather than being peculiar to a few. Moreover, such qualities are distinctly different than those peculiar patient characteristics, such as age, race, sex, national origin, financial or insurance condition, social status, politics, which may be the basis for a claim of improper motive under EMTALA. *Cleland* at 271.

Dr. Rauf's decision to limit treatment as he did in this case, although clearly an error in judgment and perhaps an error rising to level of negligence, was a medical judgment rather than a basis for discrimination. The Court is not prepared to say that such an exercise of judgment, although ill-advised, constitutes an "inappropriate motive" as a matter of federal law. Quite simply, there is no evidence to support a reasonable inference that Dr. Rauf conducted an initial screening examination of Plaintiff differently than he would have provided any other patient who was under the care of an actively treating physician, or for that matter, any other patient who did not have a treating physician. The Court, therefore, holds that Taylor County Hospital is entitled to summary judgment on the federal claims.

## V.  CONCLUSION

It would require a cold heart indeed not to feel sympathy for the unfortunate and probably preventable circumstances which befell Plaintiff. The record is replete with suggestions that Taylor County Hospital and Dr.

Rauf were negligent in their screening procedures and negligent in discharging Plaintiff without proper treatment. The sequence of events and ultimate consequences must have been like a nightmare for Plaintiff. Indeed, Plaintiff has carefully set these facts as the centerpiece of his case. However, Plaintiff's fixation upon negligence misunderstands the *federal* duties imposed by Section 1395dd. The Court's natural sympathy for Plaintiff cannot cloud the otherwise clear distinctions between claims under common law negligence and EMTALA's statutory causes of action. Moreover, this result does not leave Plaintiff without a remedy, but merely limits the jurisdiction of federal courts to consider his particular complaint.

Plaintiff asserts that the case "bristles with factual disputes." Indeed it does with respect to the professionalism of the medical care; but not with respect to any alleged motive of discharge or motive of inappropriate screening as defined in *Cleland*. On these issues, there is very little evidence; and there is no dispute. Construing the evidence in a light most favorable to Plaintiff, there are no set of facts in this case that establish improper motive, an essential element of a claim under § 1395dd. Defendants are, therefore, entitled to summary judgment on the federal claims and other pendent claims will be dismissed for lack of subject matter jurisdiction.

## ORDER AND JUDGMENT

This matter is before the Court on Defendants' motions to dismiss and for summary judgment. Having reviewed the parties memoranda, the record, and pertinent law, and the Court being otherwise sufficiently advised,

IT IS HEREBY ORDERED that the motion of Taylor County Hospital to dismiss the federal claims, construed as a motion for summary judgment, is SUSTAINED;

IT IS FURTHER ORDERED that the motion of Westlake Cumberland Hospital for

---

**8.** According to Defendant, emergency room practice requires referral to a physician after stabilization. Where a patient does not have a treating physician, that referral originates from an emergency room call roster.

summary judgment on the federal claims is SUSTAINED;

IT IS FURTHER ORDERED that the remaining pendent claims are DISMISSED without prejudice for lack of subject matter jurisdiction;

IT IS FURTHER ORDERED that the motions to dismiss of Dr. Rauf, Dr. Lessenberry, Dr. Siady, and T.J. Samson Hospital are MOOT.

This is a final and appealable order and there is no just reason for delay.