76 F.3d 378
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Tawanda DINKINS, Personal Representative of the Esate of
Stephanie Amber Dinkins, Deceased,
Plaintiff-Appellant, Cross-Appellee,
v.
HUTZEL HOSPITAL, INC., and Children's Hospital of Michigan,
Defendants-Appellees, Cross-Appellants,
The Sickle Cell Detection and Information Program, Inc., Defendant.
 Nos. 94-1643, 94-1683.
 United States Court of Appeals, Sixth Circuit.
 Jan. 30, 1996.
 
 Before: BROWN, BOGGS, and NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Tawanda Dinkins appeals from the district court's dismissal of and refusal to instruct the jury on several theories of liability in a suit to recover damages for the death of her daughter due to the failure of a testing institution to notify anyone that the daughter had sickle cell disease. Because the evidence does not support any type of agency relationship between Hutzel Hospital, where Dinkins's daughter was born, and the negligent testing agency, we affirm the trial court's disposition of the claims predicated on that hospital's liability as a principal. We affirm the trial court's decision not to offer special jury instructions because there was no evidence to support such instructions. Finally, because it did not offer substandard treatment, we agree with the trial court that Children's Hospital, where Dinkins's daughter died from acute sickle cell crisis, was not liable under the anti-patient dumping provisions of EMTLA.
 
 
 2
 * This appeal arises from a medical malpractice suit brought by Tawanda Dinkins on behalf of the estate of her deceased daughter, Stephanie Dinkins. Dinkins brought suit against three medical institutions and an individual doctor because of their purported negligence that led to Stephanie's death from complications of sickle cell anemia. The doctor, Stephanie's pediatrician, settled out of court. The three medical institutions are Hutzel Hospital ("Hutzel"), The Sickle Cell Detection and Information Program, Inc. ("the Program"), and Children's Hospital of Michigan ("Children's"). Although Hutzel filed a cross-appeal, its brief indicated that, because of the plaintiff's arguments on appeal, the cross-appeal is no longer necessary.
 
 
 3
 Dinkins went to Hutzel Hospital to give birth to her daughter in September 1986. When Dinkins checked into the hospital, she signed a consent form that read, in pertinent part:
 
 
 4
 In connection with certain routine diagnostic tests I understand that specimens of blood, urine and other bodily fluids, tissues or procedures, may be obtained and that routine tests will be performed on such fluids, tissues, and end products, and I consent to the same.
 
 
 5
 Dinkins testified that she understood this form to allow the hospital to take "blood or whatever fluids," and that she expected she would be notified about abnormalities. There is no evidence that Hutzel counseled Ms. Dinkins at this time about sickle cell disease in particular, or told that her daughter would be tested for it. Ms. Dinkins gave birth without immediate complications.
 
 
 6
 At the time of Stephanie's birth, Hutzel cooperated in a procedure that led to the testing of her blood for sickle cell disease. Although Hutzel did not perform the testing itself, it cooperated with an organization implementing a pilot program to screen for sickle cell disease, the Sickle Cell Detection and Information Program, by giving a courier from the Program a blood sample taken from Stephanie's umbilical cord. The parties stipulated that Hutzel properly labeled the blood sample, and properly released the sample to the Program.
 
 
 7
 At this point, our attention shifts to the Program and what it did and did not do with the blood sample provided by Hutzel. The parties stipulated to the fact that the Program tested the sample and that it tested positive for sickle cell disease. The failure occurred at the notification stage. Although the Program had routine procedures in place to notify the family and physicians of any newborn that tested positive for sickle cell disease, the Program apparently failed to notify anyone that Stephanie Dinkins tested positive. Dr. Jorge Rose, Stephanie's pediatrician, claimed that he was never notified of this finding, as did Ms. Dinkins. Thus, everyone concerned proceeded to deal with Stephanie as if she were a normal healthy child.
 
 
 8
 The critical stage in this matter occurred when three-year-old Stephanie became sick with flu-like symptoms, including diarrhea, vomiting, and irritability, on June 8, 1990. Her illness persisted and, on June 9, her mother took her to the emergency room at Children's Hospital of Michigan. There she was seen by an emergency room physician, Dr. Knazik, who inquired about her past medical history. Dr. Knazik had no evidence that Stephanie suffered from sickle cell disease and her medicial history did not reflect the earlier discovery by the Program of sickle cell disease. Therefore, Dr. Knazik treated Stephanie as a normal child with the aforementioned symptoms. He thus began a treatment and diagnostic regime adequate to address the symptoms he observed, but not adequate to address the actual sickle cell crisis that Stephanie was undergoing. Dr. Knazik had an X-ray taken, diagnosed an acute middle ear infection for which he administered an antibiotic, and discharged Stephanie with a prescription and instructions to return if her condition did not improve within 24 hours.
 
 
 9
 Unfortunately, Stephanie's condition continued to deteriorate upon her return home. She returned to Children's Hospital via ambulance the following day, where she later died. Stephanie's death resulted from a particular complication of sickle cell disease known as acute sickle cell crisis, where the body's immune system is unable to deal with an otherwise manageable infection. Dr. Knazik testified that Children's Hospital had in place a special protocol to deal with sickle cell crisis, but that it was not employed on June 9 because there was no evidence that Stephanie suffered from the disease.
 
 
 10
 Dinkins sued Hutzel, Children's, and the Program under a number of theories in state court. Children's had the case removed to federal court, based on federal question jurisdiction, pursuant to 42 U.S.C. § 1331, and 42 U.S.C. § 1441(b). Dinkins alleged that Hutzel was actively negligent under two theories: (1) Hutzel had an obligation to advise plaintiff that her daughter's blood was being released for sickle cell testing; and (2) Hutzel had an affirmative duty to learn of the test results and communicate them to Ms. Dinkins. Ms. Dinkins also sought to hold Hutzel vicariously liable for the actions of the Program under two agency theories: (1) that the Program was an actual agent of Hutzel for purposes of testing newborns for sickle cell disease; and (2) that the Program was the ostensible agent of Hutzel for purposes of testing newborns for sickle cell disease.
 
 
 11
 Dinkins also alleged Children's was liable under two separate theories. The first theory was that Children's was negligent for failing to test Stephanie for sickle cell disease. The second theory was that Children's violated the federal anti-patient-dumping law, 42 U.S.C. § 1395dd(a), when it discharged Stephanie without following its sickle cell treatment protocol.
 
 
 12
 Dinkins also sued the Program, but the Program is not participating in this appeal.
 
 
 13
 The scope of Dinkins's claims against Hutzel and Children's was narrowed considerably by the district court through its refusal to instruct the jury on several of the theories of liability argued by Dinkins. As to defendant Hutzel, the district court held that the only theory of negligence for which there was sufficient evidence was Hutzel's failure to secure Ms. Dinkins's informed consent. With respect to Ms. Dinkins's efforts to hold Hutzel vicariously liable for the conduct of the Program, the district court declined to instruct the jury that it could find that the Program was either an actual or an ostensible agent of Hutzel.
 
 
 14
 The claims against Children's were similarly narrowed. The district court dismissed the patient-dumping claim because there was no evidence that Children's treated Stephanie any differently than any other child arriving at its emergency room with Stephanie's symptoms and lack of sickle cell history. The court allowed the jury to rule on Dinkins's theory of negligence grounded in Children's failure to ascertain that Stephanie had sickle cell disease.
 
 
 15
 At trial, both Hutzel and Children's were held blameless by the jury. The jury found that Hutzel was professionally negligent for failing to obtain informed consent from Ms. Dinkins, but that this negligence was not the proximate cause of the plaintiff's damages. The Sickle Cell Detection Program declined to participate in the trial, and the jury found the Program negligent in Stephanie's death and awarded damages of $3 million, although plaintiff had only asked for $2 million. The district court's decisions foreclosing proof on Dinkins's various other theories of negligence form the basis of her appeal.
 
 II
 
 16
 Dinkins's seven allegations of error can be divided into three areas: 1) alleged errors resulting from foreclosure of the agency theories linking Hutzel Hospital with the Program; 2) alleged errors resulting from the district court's rejecting Dinkins's jury instructions on particular methods of finding Hutzel negligent (voluntary undertaking, failure to obtain and notify of test results, and violation of federal regulations); and 3) the allegation that the district court erroneously decided that the patient-dumping claim against Children's lacked enough factual support to send it to the jury.
 
 III
 
 17
 Three of the plaintiff's seven allegations of error relate to her efforts to hold Hutzel liable for the actions of the Sickle Cell Detection Program: 1) the denial of summary judgment on ostensible agency; 2) the refusal to instruct on ostensible agency; and 3) the refusal to instruct on actual agency. Each of the individual allegations of error have particular problems, while collectively they suffer from a nearly complete absence of factual support for any type of agency relationship between Hutzel and the Program.
 
 
 18
 We review de novo a district court's decision to grant or deny a motion for summary judgment. We apply Michigan law to resolve the ostensible agency questions. The court in Little v. Howard Johnson Co., 183 Mich.App. 675, 679, 455 N.W.2d 390, 394 (1990), outlined the test for the existence of ostensible agency under Michigan law as follows:
 
 
 19
 [First] The person dealing with the agent must do so with the belief in the agent's authority and this belief must be a reasonable one; [second] Such belief must be generated by some act or neglect of the principal sought to be charged; [third] and the third person relying on the agent's apparent authority must not be guilty of negligence. [Sasseen v. Community Hosp. Foundation, 159 Mich.App. 231, 238, 406 N.W.2d 193 (1986), quoting Grewe v. Mt. Clemens General Hosp., 404 Mich. 240, 253; 273 N.W.2d 429 (1978) ].
 
 
 20
 The Little court went on to conclude that "the alleged principal must have made a representation that leads the plaintiff to reasonably believe that an agency existed and to suffer harm on account of a justifiable reliance thereon." Ibid.
 
 
 21
 This theory has been relied upon in many cases to hold a hospital liable for the actions of medical personnel not employed by the hospital, but functioning in the hospital in such a way as to convince patients that they are a part of the hospital. In Grewe, for example, a hospital was held responsible for the actions of emergency room physicians who reasonably appeared to be part of the hospital. See also Howard v. Park, 37 Mich.App. 496, 195 N.W.2d 39 (1972) (hospital bound by ostensible agency for doctor who improperly removed cast where doctor was independent contractor but, by all appearances to plaintiff, was employee of hospital).
 
 
 22
 Dinkins thus argues that when she went to Hutzel Hospital to deliver Stephanie, she looked to the hospital to "meet her ... medical needs," and that "under these circumstances, the medical facility is precluded or 'estopped' from avoiding liability for the patients (sic) negligence (sic) injury on the grounds that the professionals (sic) personnel provided were actually independent contractors." Plaintiff's Brief at 27. To develop this argument, the plaintiff's brief simply cites and recounts the facts in Howard and Grewe. The plaintiff further contends that she "held a reasonable belief that Hutzel Hospital would conduct all necessary blood tests during her hospitalization," and that "[t]his belief was generated by the general consent form which Hutzel Hospital required plaintiff to sign at the time of her admission to the hospital...." Plaintiff's Third Brief at 24. Finally, the plaintiff concludes that Hutzel "did nothing to put plaintiff on notice that the sickle cell disease screening test would be conducted by an independent facility and that plaintiff would be notified by that facility." Id. at 25.
 
 
 23
 We reject the plaintiff's arguments that the theory of ostensible agency has any relevance to the facts presented here because Dinkins had no expectation of sickle cell testing and in no way relied upon any act or ommission of Hutzel in her relationship with the Program. Dinkins simply claims that she was relying on Hutzel to perform all necessary medical services.
 
 
 24
 However, Dinkins cannot establish the reliance element of an ostensible agency theory by reference to a generalized expectation that the hospital would do everything necessary for her care. None of the Michigan cases take such an approach. Ms. Dinkins had no expectation that her overall care would include sickle cell screening for her newborn. She admitted that she was never informed or advised that she should expect sickle cell screening for Stephanie. For these reasons we affirm the district court's decision to deny summary judgment on Dinkins's ostensible agency theory.
 
 
 25
 For the same reasons, we affirm the trial court's decision to refuse to instruct the jury on Dinkins's ostensible agency theory. We have previously held that a trial court will not be reversed for failure to instruct a jury on a particular theory where the litigant has not first shown the presence of sufficient evidence to support the theory. Bucyrus-Erie Co. v. General Products Corp., 643 F.2d 413, 420 (6th Cir.1981). As we have discussed, there is nothing in the record to suggest that Ms. Dinkins would have been able to prove any of the elements necessary to establish that the Program was the ostensible agent of Hutzel Hospital.
 
 
 26
 Dinkins also alleges error due to the trial court's refusal to instruct the jury on her theory that the Program was the actual agent of Hutzel. Under Michigan law, for a party to be considered a "principal," it must have the right to control the purported agent. Little v. Howard Johnson Co., 183 Mich.App. 675, 678, 455 N.W.2d 390, 393 (1990). The plaintiff is quick to point out, however, that the right to control need not be exercised, and can be inferred from the circumstances. Ardash v. Karp, 18 Mich.App. 241, 244, 170 N.W.2d 854, 856 (1969). Even giving credit for circumstantial evidence of an agency relationship, when all the facts that could support the theory of the Program as the agent of Hutzel are assembled, there is no question left for a jury and the trial court correctly refused to instruct.
 
 
 27
 To support her agency argument, the plaintiff points to three areas of the record, none of which support the existence of any type of agency relationship between Hutzel and the Program. Dinkins first argues that the general consent form allowing blood to be drawn for routine testing establishes that the Program was Hutzel's agent because "Dr. Whitten [the director of the Program] agreed that the sickle cell disease screening performed by his organization could not have been performed without the consent secured by Hutzel Hospital." Plaintiff's Third Brief, at 18. The argument does not show how this fact speaks to the question of whether Hutzel had the right to control the Program or relates to agency doctrine at all. The implication would appear to be that this gave Hutzel sufficient leverage over the Program that it could control the Program. Even were this true, it would still not establish a "right to control," as required by the Michigan law of agency.
 
 
 28
 Dinkins next argues that Hutzel "was providing Sickle Cell disease testing as a patient service which it deemed appropriate for the care and treatment of African-American newborns delivered at the hospital." Plaintiff's Third Brief at 18. This statement would appear irrelevant and a gross mischaracterization of the record. Hutzel never endeavored to provide screening in any way other than by its decision to cooperate with the Program. The totality of the record reflects that Hutzel was simply approached by an innovative effort in this area, and agreed to cooperate. Even if the plaintiff's version were true, it does not establish the fact that the Program was an agent of Hutzel.
 
 
 29
 Finally, Dinkins claims that "there was evidence in the record that Hutzel Hospital, itself, had an obligation to notify plaintiff of the sickle cell disease screening results." Ibid. By this, Dinkins presumably means the testimony of their expert, Dr. Lubin, to the effect that Hutzel should have notified participants. She goes on to assert that "[a]s part of a negotiated arrangement with Hutzel Hospital, however, the Program assumed the responsibility of notifying the newborn's physician of record by letter." Ibid. There is no evidence of any agreement between Hutzel and the Program other than an understanding that Hutzel would supply blood for the program to test. Most importantly, there is no evidence that Hutzel had any right to control the Program.
 
 
 30
 No matter how the plaintiff rearranges the facts or rewords Hutzel's explanation of its relationship with the Program, the record indicates that Hutzel drew blood, labeled it, and turned it over to the Program for testing. The record reflects that Hutzel was approached by the Program and gratuitously agreed to provide blood for screening--without ever having done any screening on its own before the Program entered the picture. There is no evidence to suggest Hutzel even had any formal arrangement with the Program and certainly no evidence to suggest that the Program acted as Hutzel's agent. The trial court's decision to refuse a jury instruction that would have allowed a determination of negligence under an agency theory should therefore be affirmed.
 
 IV
 
 31
 Dinkins has also alleged three other errors in the trial court's jury instructions: (1) failure to instruct the jury on her theory of voluntary undertaking; (2) failure to instruct the jury on Hutzel's failure to obtain and disseminate the results of the screening; and (3) failure to instruct that it would be negligence if Hutzel violated federal regulations pertaining to informed consent in testing situations.
 
 
 32
 A review of the record shows no support for the plaintiff's voluntary undertaking theory, and thus the trial court was justified in refusing this instruction. Because Hutzel argued that the standard of care did not require sickle cell screening, the plaintiff requested a special jury instruction (plaintiff's special jury instruction number 1) to the effect that "even if Defendant Hutzel Hospital voluntarily undertook to test Stephanie for sickle cell disease, the Hospital had a duty to exercise reasonable care in connection with that undertaking." The plaintiff merely cites three Michigan cases without any elaboration of their holdings, and concludes that failure so to instruct was reversible error.
 
 
 33
 We believe, however, that the record offered no support for the argument that Hutzel voluntarily undertook sickle cell testing. To establish this theory, the plaintiff must produce evidence that Hutzel undertook to screen for sickle cell, that Hutzel either (a) failed to use reasonable care, thereby increasing the risk of harm, or (b) undertook to perform a duty owed by another to the plaintiff, or (c) the harm suffered was caused by reliance on Hutzel's undertaking. See Restatement of Torts 2d, § 324A, and Smith v. Allendale Mut. Ins. Co., 410 Mich. 685, 303 N.W.2d 702 (1981).
 
 
 34
 As the defendant points out, none of the elements needed for a voluntary undertaking theory are present. Hutzel never formally undertook to screen for sickle cell, and its involvement was limited to providing a cord-blood specimen. It would appear to have done so in an entirely non-negligent manner. We cannot construe this as equivalent to an undertaking to screen for sickle cell or to notify patients of the Program's results. Such a construction of institutions' voluntary participation in innovative programs would deter such beneficial efforts and is materially different from a decision to offer a particular service. The plaintiff does not claim any type of specific reliance on Hutzel to provide screening or notify her of the results. She cannot claim that she went to Hutzel specifically expecting sickle cell testing and notification. We therefore conclude that Hutzel did not undertake a duty of either screening or notification and that, in any event, the harm caused to Stephanie was not the result of Dinkins's reliance on any action by Hutzel.
 
 
 35
 The argument concerning failure to obtain and disseminate the results differs slightly from the other allegations of error stemming from jury instructions because the plaintiff does not argue that the trial court failed completely to instruct on the theory. Rather, the plaintiff contends that the instruction was overly general and did not allow the jury to conclude that Hutzel was negligent for failing to obtain informed consent and for failing to inform the plaintiff or her physicians of the results.
 
 
 36
 As a result, the standard of review is more deferential to the trial court and does not require the absence of a factual basis for the instruction. Rather, the inquiry is whether the instructions gave the jury adequate guidance to decide the issues that were tried. Teal v. E.I. DuPont de Nemours & Co., 728 F.2d 799, 802 (6th Cir.1984).
 
 
 37
 The plaintiff's argument is very vague. She explains only that the trial court "eviscerated" her theories of liability based on informed consent and failure to disseminate results because the instruction explained that "the jury could only find Hutzel Hospital professionally negligent if it determined that the Hospital's failure to obtain a proper consent was a proximate cause of Stephanie's death." Plaintiff's Brief at 35. Aside from this assertion, the plaintiff offers no analysis to explain why this is so or why the instruction was incorrect. The exact nature of the error here is unclear.
 
 
 38
 Even if there was a clear allegation of error, we conclude that there was no error in the instruction. First, with respect to the informed consent theory, the general instruction came directly from the Michigan Standard Jury Instruction on professional negligence or malpractice, S.J.I.2d 30.01 and was augmented by more detailed instructions on informed consent claims. Next, with regard to the "failure to notify of results" theory of negligence, there is nothing to suggest that Hutzel had a duty to notify, no evidence that it was negligent in this regard, given that the Program had a notification protocol, and no argument from the plaintiff as to why the general instruction regarding malpractice was insufficient to inform the jury's consideration of this theory. When considered in light of the record and the standard of review, the jury instructions were well within the court's discretion and warrant affirmance.
 
 
 39
 Dinkins's final allegation of error concerns her theory that Hutzel was negligent if it violated a federal regulation requiring informed consent. The plaintiff has changed this allegation of error between its initial brief and its "Third Brief." The initial brief, in one paragraph, claims that an instruction that a violation of 45 C.F.R. § 46 by Hutzel is evidence of negligence was "consistent with applicable case law." The third brief apparently alleges error in denying an amendment to the pre-trial order to include this theory. Either way the argument is presented, it was rendered moot by the jury's verdict.
 
 
 40
 Although Dinkins is correct that 45 C.F.R. § 46 establishes requirements for obtaining the informed consent of individuals involved in research, jury instructions to this effect would not have changed the outcome of this case. The jury returned a verdict finding Hutzel negligent on the general informed consent theory, but concluded that such negligence was not a proximate cause of Stephanie's death. It is thus pointless to consider whether another theory that also would have established negligence related to informed consent should have been presented to the jury. If there were any error, it was harmless.
 
 V
 
 41
 Finally, Dinkins asserts error in the dismissal of her claim that Children's Hospital violated the federal anti-patient-dumping provisions in the Emergency Medical Treatment and Active Labor Act ("EMTLA"), 42 U.S.C. § 1395dd. Although EMTLA does prevent hospital emergency rooms from "dumping" indigent patients, and this circuit has held that it imposes a duty of appropriately screening those who come to emergency rooms, Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 268 (6th Cir.1990), there is absolutely no evidence of wrongdoing on the part of Children's. The Bronson court explained that "a discharge that to the knowledge of those conducting it left a patient with an 'emergency medical condition' in an 'unstable' condition would be actionable." Id. at 272. Because Stephanie's relatively rare condition was unknown to all concerned, the plaintiff cannot show either inappropriate screening or the knowing discharge of a dangerously ill individual. Children's provided entirely appropriate screening and treatment to Stephanie, given its understandable lack of knowledge of her sickle cell status.
 
 
 42
 Dinkins argues that Children's had a protocol in place that required special treatment for a child with sickle cell disease who presented with an elevated temperature, and that the hospital's failure to implement this protocol constitutes a violation of EMTLA, even though the hospital did not initiate the protocol because the staff did not know Stephanie had sickle cell disease.
 
 
 43
 There is no evidence that Children's cut any corners in failing to inquire about sickle cell. Sickle cell disease, along with many other maladies, is not a sufficiently common occurrence to warrant testing all children who present to an emergency room. The usual questions were asked, and even if the treating physician had inquired about sickle cell, he would have found out nothing from Ms. Dinkins--she did not know her daughter had the disease.
 
 
 44
 In short, all the evidence establishes that Stephanie was treated identically to any other young child that presented with an elevated temperature. The hospital met the standard of care to the letter. The fact that this standard was inadequate to save Stephanie's life does not constitute a violation of federal law. When Children's released Stephanie, it was with the belief that it had done all that was needed to address Stephanie's needs. The plaintiff's EMTLA claim was thus defective as a matter of law and was correctly dismissed.
 
 VI
 
 45
 The decision of the district court is therefore AFFIRMED.