RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0107P (6th Cir.)
File Name: 03a0107p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JANE ROBERTS, as Guardian
for Wanda Y. Johnson,
    *Plaintiff-Appellant/*
    *Cross-Appellee,*

      *v.*

GALEN OF VIRGINIA, INC.,
formerly d/b/a HUMANA
HOSPITAL-UNIVERSITY OF
LOUISVILLE, d/b/a
UNIVERSITY OF LOUISVILLE
HOSPITAL,
    *Defendant-Appellee/*
    *Cross-Appellant.*

Nos. 01-5334/5390

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 93-00544—Charles R. Simpson III, District Judge.

Argued: December 10, 2002

Decided and Filed: April 9, 2003

1

---

Before: BATCHELDER and MOORE, Circuit Judges;
COLLIER, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Joseph H. Mattingly III, Lebanon, Kentucky, for Appellant. Bryan Todd Thompson, THOMPSON, MILLER & SIMPSON, Louisville, Kentucky, for Appellee. **ON BRIEF:** Joseph H. Mattingly III, Lebanon, Kentucky, for Appellant. Bryan Todd Thompson, Millicent A. Tanner, Audra J. Eckerle, THOMPSON, MILLER & SIMPSON, Louisville, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court, in which COLLIER, D. J., joined. BATCHELDER, J. (pp. 23-24), delivered a separate concurring opinion.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge. The plaintiff, Jane Roberts (as guardian for the injured Wanda Johnson), lost a jury trial in her suit against the defendant, Galen of Virginia ("Galen"). Roberts claimed that Galen had improperly transferred Johnson from Humana Hospital (which Galen operated) to Crestview Health Care Center, in violation of the federal Emergency Medical Treatment and Active Labor Act ("EMTALA") as well as Kentucky negligence statutes. Roberts now appeals to this court, alleging that the trial judge erred by dismissing her *Batson* challenges, in permitting Galen's expert Dr. Charash to testify, by failing to sequester one of Galen's witnesses, and

———————————————————

[*] The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

in giving improper jury instructions. Galen cross-appeals, contending that it should have been granted judgment as a matter of law.

For the reasons set forth below, we find that none of the plaintiff's contentions of error justify reversal. We therefore **AFFIRM** the judgment of the district court. Having resolved the case in favor of the defendant, we do not reach the defendant's alternative contention that it should have been granted judgment as a matter of law.

## I. BACKGROUND

After being injured in a serious automobile accident, Wanda Johnson was transported to Humana Hospital, on May 20, 1992, with extensive injuries to her brain, spine, right leg, and pelvis. On her arrival, the doctors at Humana worked to stabilize her condition. Though Johnson's condition improved, it was clear that recovery was going to be gradual. Nancy Fred, a social worker for Humana (along with Dr. Walid Abou-Jaoude, Johnson's physician at Humana), investigated the possibility of transferring Johnson to a skilled nursing facility. Johnson remained at Humana for roughly two months, until July 24, 1992, when she was transferred from Humana, which is in Louisville, Kentucky, to Crestview Health Care Center in Indianapolis, Indiana. Upon arrival at that facility, her condition significantly deteriorated. She was later transferred to Midwest Medical Center, also in Indiana. This lawsuit arises out of Roberts's contention that Galen, by choosing to transfer Johnson when she was unstable, violated both EMTALA and Kentucky negligence statutes.

At trial, the facts were developed further. Donna Kaelin, Suzanne Griffith, and Karen Martin, who were nurses at Humana, had monitored Johnson's condition in the 36 hours before the transfer. They noted that Roberts had an elevated white blood-cell count and temperature, cloudy urine, and expiratory wheezes. The nurses also reported caring for Johnson's right lung, the upper portion of which had

collapsed on the night of July 22, 1992. The nurses recorded their observations on Johnson's charts. Karen Martin, who was on duty when Johnson was actually transferred, explicitly noted that she had not only charted her observations, but had brought them to the attention of Dr. Abou-Jaoude, who was Johnson's physician and the physician in charge of the transfer.

Since Johnson had experienced multiple urinary tract infections due to her indwelling Foley catheter, Abou-Jaoude suspected that the elevated temperature and cloudy urine were symptomatic of another urinary tract infection. Abou-Jaoude took chest x-rays and a bronchoscopy, and a urine culture was obtained. The x-rays indicated that Johnson's partially collapsed lung was stable and improving. Preliminary reports on the urine culture suggested to Abou-Jaoude that it was a case of colonized bacteria, a routine problem with patients hospitalized for long periods of time. Abou-Jaoude also noted that many of Johnson's symptoms — such as her high white blood-cell count and elevated temperature — had existed since her arrival at Humana and were likely not probative of anything. Believing that Johnson likely had a urinary tract infection and was in no serious danger, Abou-Jaoude put her on Bactrim, an antibiotic, and continued with her transfer.

After her transfer to Crestview, however, Johnson's condition deteriorated; she developed a case of active pneumonia and suffered lasting damage. The plaintiff disputes whether Johnson's condition was stable enough for her to be transferred. Dr. John Stuy, the plaintiff's expert, testified that the hospital should have held Johnson until it received final reports (rather than just preliminary ones) on the urine culture. Stuy testified that Johnson's ability to fight off infection was extremely compromised and that an infection could have easily spread into the bloodstream causing sepsis and eventual death. Stuy noted that when Johnson was admitted to the Midwest Medical Center she was diagnosed with active pneumonia and that such pneumonia

could have been present at the time of the transfer. The defendant's medical experts all contradicted Dr. Stuy, and argued that there was no objective evidence of a significant infection at the time of the transfer. They stated that it was common and appropriate to transfer a patient without a final report as long as the patient did not have active sepsis.

This case comes before us as an appeal from a jury verdict for the defendant. The complaint in this case was filed on August 30, 1993. Initially, the defendant was given summary judgment by the district judge, who held that liability under EMTALA's stabilization requirement could not be established without a showing that the hospital was motivated by improper financial considerations. Our court affirmed. *See Roberts v. Galen of Virginia, Inc.*, 111 F.3d 405 (6th Cir. 1997). The Supreme Court reversed in a per curiam opinion, holding that EMTALA's stabilization provision did not require the plaintiff to show an improper motive on the part of the defendant. *See Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249 (1999). On remand from this court, the district court held a trial on liability which began on February 12, 2001. This appeal arises from the resulting jury verdict for the defendant.

## II. ANALYSIS

### A. Jurisdiction

The district court below had jurisdiction over Roberts's EMTALA claim pursuant to 42 U.S.C. § 1395dd and 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law negligence claim pursuant to 28 U.S.C. § 1367. This court has jurisdiction over the entire case pursuant to 28 U.S.C. § 1291.

### B. The *Batson* Claim

Roberts alleges four independent errors on the part of the trial judge. Roberts's first claim is that the defendant's attorneys used some of their peremptory challenges to eliminate black jurors, in violation of the Equal Protection Clause. *See Batson v. Kentucky*, 476 U.S. 79 (1986). A district court's ruling on whether the exercise of a peremptory challenge violates equal protection is entitled to "'great deference,'" and therefore, "we may not disturb its judgment unless it is clearly erroneous." *McCurdy v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001) (citation omitted); *see also United States v. Hill*, 146 F.3d 337, 342 (6th Cir. 1998) (stating that "the district court has the responsibility to assess the prosecutor's credibility under all of the pertinent circumstances"). Our usual three-part approach to *Batson* challenges was laid out in *McCurdy*:

> To establish a[n] equal protection violation under *Batson*, the claimant must first establish a *prima facie* case of racial discrimination. . . . If the claimant establishes a *prima facie* case, the party exercising the peremptory must proffer a race-neutral explanation. . . . After the defending party offers its race-neutral justification, the challenging party must demonstrate that the purported explanation is merely a pretext for a racial motivation.

*McCurdy*, 240 F.3d at 521. Here, however, the district court asked for an explanation for the strike without considering whether the Roberts had established a prima facie case. Under these circumstances, the question "'boils down to whether [Roberts] established by a preponderance of the evidence that the peremptory strikes were intentionally discriminatory.'" *United States v. Gibbs*, 182 F.3d 408, 439 (6th Cir.) (citation omitted), *cert. denied*, 528 U.S. 1051 (1999); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991) (noting that once a party "has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional

discrimination, the preliminary issue of whether the [challenger] had made a prima facie showing becomes moot").

When analyzing *Batson* challenges, we have stated that a proffered race-neutral reason "need not be persuasive, or even plausible, but merely facially valid." *Hill*, 146 F.3d at 341. However, a party "may not rely on his assurances of good faith." *Gibbs*, 182 F.3d at 439. District courts are required to "independently assess the proffered justifications" and "'explicitly adjudicate the credibility of [these] race-neutral justifications,'" particularly in cases "when the purported race-neutral justification is predicated on subjective explanations like body language or demeanor." *McCurdy*, 240 F.3d at 521 (citation omitted).

In this case, the court was left with sixteen jurors after conducting voir dire. Each party was granted four peremptory strikes. Each side used all of its strikes, leaving the eight jurors that made up the jury. The defendant used two of its peremptories to strike the only two black jurors in the jury pool. After the plaintiff objected, the district judge ordered defense counsel to justify its exclusion of the two challenged black jurors. Counsel stated that he struck the two challenged jurors because they were scowling during voir dire, and because he believed that they might be unable to understand the case because of their occupations (one being a janitor and the other a laborer) or, alternatively, might be favorably disposed to rule for the plaintiff. After discussing the issue with both sets of counsel, the district judge then ruled on the challenge:

> I don't find that the Plaintiff has met her burden of proof in showing purposeful discrimination here. I think the justifications that have been made are well-within the parameters of permissibility. And those of us who have tried cases, there are many times that you know the type of juror you would ideally like to see for a particular case, not racially but the type of juror for purpose of

> education, attention span, or anything else including scowling. And jurors don't always raise their hand and say, "I don't like a particular party," but sometimes there are clues in the jury selection process that lead the artful practitioner to decide to strike one over the other. I think that's the situation we have here, so I'll overrule the objection.

Joint Appendix ("J.A.") at 423 (Trial Tr.).

Roberts has not made out a case of racial discrimination under *Batson*. The defendant gave plausible race-neutral reasons for excluding the jurors, and Roberts has put forth no evidence to contest these race-neutral justifications. Moreover, the district court explicitly determined these race-neutral justifications to be credible and valid. Given the deference that we are obliged to give to the trial court's perception of the validity of the defendant's stated race-neutral justifications, Roberts's *Batson* challenge fails.

Roberts seems to recognize that she has presented no evidence of racial discrimination but instead urges us to reverse the district court on the basis that the district judge did not adequately evaluate the defendant's stated race-neutral reasons, as required by *McCurdy*. Roberts overstates how much we require of a district judge in this context. In *McCurdy*, this court found a district court's initial *Batson* inquiry to be insufficient (though we ultimately found a second, more extensive inquiry, sufficient) because the judge "perfunctorily accepted the County's race-neutral explanation." *McCurdy*, 240 F.3d at 521. We held that it was inappropriate for a district court to dismiss McCurdy's *Batson* objection "[w]ithout questioning [the juror], or engaging in a colloquy with either McCurdy's or the County's counsel." *Id.* at 520. Here, however, the district judge investigated the *Batson* claim, questioning both sets of counsel, and then explicitly adjudicated the defendant's race-neutral justifications to be valid. Such an investigation complies with the requirements of both *Batson* and *McCurdy*.

## C.  Discovery Sanctions under Rule 26(a)(2)(B)

Roberts next claims that the district court erred in not excluding the testimony of Dr. William Charash, one of Galen's experts, because Galen failed to comply with the mandatory-disclosure provisions of Federal Rule of Civil Procedure 26(a)(2)(B).  Specifically, Roberts alleges that Charash's report was never signed, did not contain the data that Dr. Charash used in forming his opinions, did not list his publications or the amount he would be compensated, and did not include a copy of his curriculum vitae.  Roberts argues that the trial judge should have sanctioned Galen for not providing this information until shortly before trial.

Rule 26(a)(2)(B) generally requires parties to make mandatory disclosures about their experts:

> Except as otherwise stipulated or directed by the court, this disclosure shall . . . be accompanied by a written report prepared and signed by the witness.  The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed. R. Civ. P. 26(a)(2)(B).  Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it "mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Vance v. United States*, No. 98-5488, 1999 WL 455435, at *3 (6th Cir. June 25, 1999) (footnote omitted); *see also Salgado v. General Motors*

*Corp.*, 150 F.3d 735, 742 (7th Cir. 1998) (noting that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless").  We agree with the circuits that have put the burden on the potentially sanctioned party to prove harmlessness. *See Salgado*, 150 F.3d at 741-42; *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001); *Heidtman v. County of El Paso*, 171 F.3d 1038, 1040 (5th Cir. 1999).  The decision not to impose sanctions is reviewed for an abuse of discretion. *See King v. Ford Motor Co.*, 209 F.3d 886, 900 (6th Cir.), *cert. denied*, 531 U.S. 960 (2000).

In this case, Dr. Charash was originally not scheduled to testify at all.  Instead, Dr. Larry Micon was going to testify for Galen.  Micon's report had been properly disclosed in 1994 before trial began.  Due to previous appeals to this court and to the United States Supreme Court, however, there was a seven-year lag between the filing of the lawsuit and the trial.  As a result, Micon was not available to testify.  Galen therefore substituted Charash to take his place.

At a pretrial hearing on June 26, 2000, Roberts objected to the substitution of Charash for Micon.  The district judge allowed the substitution.  A month later, Galen submitted a two-page summary of Charash's qualifications and prospective testimony.  The two-page summary stated that copies of Dr. Charash's curriculum vitae ("CV") had been requested and would be turned over when received.  The summary explained that Charash was going to testify to the same conclusions that Micon espoused.  Galen also stated at that time that Charash's testimony would not go beyond Dr. Micon's.

This issue was dormant for five months until Roberts moved to strike Charash's testimony one month before trial, in January of 2001.  This motion was debated at the final pretrial conference on February 6, 2001, six days before the trial began.  At the final pretrial conference, Roberts argued

that Charash's CV had never been supplied and that Charash never reported what his conclusions would be. The court questioned Galen's counsel, who stated that Charash was going to testify as Micon would have testified and that no independent report was therefore needed. Galen's counsel also stated that he had not yet seen Charash's CV. The court ordered Galen immediately to produce Charash's CV and told both parties that it would not permit Charash to testify differently than Micon's report. With these restrictions, the court allowed Charash to testify.

Roberts argues that district court's actions were erroneous and that the judge should have prevented Charash from testifying because of the violations of Rule 26(a)(2)(B). Specifically, Roberts argues that no detailed report was ever filed, that Charash's CV was not provided until a week before trial, that Charash never signed the report, and that no one disclosed Charash's publications or the amount he was paid. We hold that this claim of error fails.

First, we observe that these allegations all seem either factually incorrect or relatively harmless in the context of this case. Roberts alleges that she was never informed as to the contents of Charash's expected testimony, but the two-page summary produced by Galen belies that claim. Delivered to Roberts at the July 2000 hearing, the summary explains how Charash was going to testify by stating that Charash was going to follow the conclusions of Dr. Micon's original report, which had been disclosed earlier to Roberts. Roberts then complains that Charash did not sign the report and that no one disclosed Charash's publications or the amount he was paid. These failures to disclose all seem relatively harmless here. Roberts's counsel knew who was going to testify and to what they were going to testify. This fact alone makes this case atypical of cases where sanctions have been justified under Rule 37(c)(1). *See, e.g.*, *Ames v. Van Dyne*, No. 95-3376, 1996 WL 662899, at *4-*5 (6th Cir. Nov. 13, 1996) (affirming the exclusion of an expert witness at trial when the opponents had no advance knowledge of the fact that the

witness would testify); *Bowe v. Consolidated Rail Corp.*, No. 99-4091, 2000 WL 1434584, at *3-*4 (6th. Cir. Sept. 19, 2000) (affirming the exclusion of an expert witness at trial when the defendants had no knowledge of the substance of the expert's reports). We also note Roberts's counsel knew that they had not received these disclosures and waited for five months to voice an objection. Roberts apparently never asked for any of these documents in that time period, and never made a motion to compel disclosure under Rule 37(a)(2)(A). The fact that Roberts knew of the lack of disclosures and Galen apparently did not may suggest that these violations should be considered substantially justified or harmless. *Vaughn v. City of Lebanon*, 18 Fed.Appx. 252, 264, 2001 WL 966279, at *9 (6th Cir. Aug. 16, 2001) (noting that commentary to Rule 37(c)(1) "'strongly suggests that [a] 'harmless' [violation] involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party'") (citation omitted); *see also* Fed. R. Civ. P. 37(c)(1) advisory committee's note (1993) (giving as an example of a harmless violation the "inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties").

Even if we assume that these violations were not justified or harmless, however, Rule 26 was satisfied here because — contrary to Roberts's claims — the district court *did* sanction Galen. Roberts intimates in her brief that the only appropriate sanction for Galen's alleged violations is the total exclusion of Charash's testimony. Rule 37(c)(1), however, provides several remedies to a district judge who is faced with violations of the mandatory-disclosure provisions of Rule 26. The provision on sanctions explicitly states in pertinent part that "in lieu of this sanction [of total exclusion], the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." Fed. R. Civ. P. 37(c)(1). Rule 37(c)(1) does not compel the district judge to exclude testimony in its entirety. *See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 615-16 (7th Cir. 2002) ("As some cases fail to note, however, . . . the rule goes on to

authorize the judge, 'in lieu of this sanction . . . to impose other appropriate sanctions.'"); *Vance v. United States*, No. 98-5488, 1999 WL 455435, at *4 (6th Cir. June 25, 1999) (noting that Rule 37(c)(1) is mandatory, but that "the rule somewhat tempers this mandate by permitting courts to excuse failures to disclose to some degree (i.e., to impose other sanctions 'in lieu of this sanction')"); Fed. R. Civ. P. 37(c)(1) advisory committee's note (1993) (noting that "the rule provides the court with a wide range of other sanctions"). In fact, the advisory note specifically lists "preventing contradictory evidence" as an alternative way to sanction a party, which is what the district judge did here. By refusing to allow Charash to testify to matters outside of Micon's report, the district judge prevented Galen from deviating from Micon's prior conclusions. This sensible compromise allowed Galen to replace its expert without unfairly surprising Roberts with unexpected new opinions. This solution was an equitable one, consonant with both the text and logic of Rule 37(c)(1). We therefore dismiss this contention of error.

## D. Sequestration Challenge Under FRE 615

Roberts's next claim is that the district judge failed to sequester trial witness Nancy Fred, as required by Federal Rule of Evidence 615. Galen contends that Fred falls within an exception to the general rule; Roberts contends that all the exceptions are inapposite.

This court reviews the district court's decision to deny sequestration for an abuse of discretion. *See United States v. Mohney*, 949 F.2d 1397, 1404 (6th Cir. 1991) (holding that "[t]he decision to permit a witness to remain in the courtroom 'is within the discretion of the trial judge and should not normally be disturbed on appeal'") (citation omitted), *cert. denied*, 504 U.S. 910 (1992). Even if Roberts can show that the district court abused its discretion, there must be evidence that "the failure to exclude witnesses harmed [Robert's] case." *William L. Comer Family Equity Pure Trust v. Comm'r*, 958 F.2d 136, 141 (6th Cir. 1992). In general,

Federal Rule of Evidence 615 requires that witnesses be sequestered when sequestration is requested by one of the parties, except when the witness is:

(1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

Fed. R. Evid. 615.

The second exception is the one that Galen claims is most relevant here. The notes of the Advisory Committee explain that "[a]s the equivalent of the right of a natural-person party to be present, a party which is not a natural person is entitled to have a representative present." Fed. R. Evid. 615 advisory committee's note (1972). Corporations are allowed to choose any officer or employee as their designated representative.[1] *See Queen v. Washington Metro. Area Transit Auth.*, 842 F.2d 476, 482 (D.C. Cir. 1988) (rejecting the claim that the

---

[1] This is required by the rule, even though it may frustrate the rule's general purpose:

[R]ecognition of this exception clearly subverts the policies behind Rule 615's general requirement of excluding witnesses. A party will often appoint as its representative the officer or employee most knowledgeable about the case. Thus, this second exception can give that crucial witness the opportunity to hear the other witnesses and tailor his testimony accordingly. Notwithstanding this risk, Rule 615(2) recognizes the exception in order to afford a party that is not a natural person a right comparable to the right the first exception affords to natural persons. This seems appropriate since criminal cases will always and civil cases will often match a party that is not a natural person against a party that is a natural person. Failure to equalize Rule 615 treatment of parties within the same case may not pose constitutional problems, but still smacks of unfairness.

Charles Alan Wright & Victor James Gold, 29 *Federal Practice and Procedure* § 6245, at 76 (1997) (footnote omitted).

exception only applied to officers and agents of parties empowered to bind the corporation through their testimony). Galen is plainly entitled under Rule 615 to have a corporate officer or employee with counsel at trial.

Roberts argues, however, that Nancy Fred is merely a *former* employee of Galen's and therefore not an "officer or employee" of Galen's within the meaning of the exception. At the time of the incident, Galen operated Humana Hospital-University of Louisville and employed Nancy Fred. By the time of trial, however, Galen no longer operated Humana and did not employ Fred. In fact, at trial, the district court found that Galen was "no longer operating" at all and had "no employees." J.A. at 286 (Dist. Ct. Order). The district court applied Rule 615 as if Galen were an operating corporation and permitted Galen's counsel to designate Fred as its Rule 615 representative.

We agree with the district court and hold that Nancy Fred can qualify for the exception in Fed. R. Evid. 615(2). The purpose of the second exception to Rule 615 is to give corporations the right to have a representative present throughout a trial. If Roberts's position were adopted, then a corporation like Galen, who has no current employees and is no longer operating, would not be entitled to any representative at trial at all. This would be unfair given that natural parties — like Roberts, in this case — have the right to avoid sequestration. *See* Fed. R. Evid. 615 advisory committee's note (1972) (noting that "[e]xclusion of persons who are parties would raise serious problems of confrontation and due process"). Under the circumstances here, however, Galen had a right under Fed. R. Evid. 615(2) to designate Nancy Fred, and the district court did not err in exempting Fred from sequestration.

## E. Jury Instructions

Roberts's last claim is that the district court gave erroneous and prejudicial jury instructions. The court instructed the jury

that Roberts had to prove that the "physician responsible for [the] transfer had actual knowledge of that condition" for liability under the stabilization provision of EMTALA, 42 U.S.C. § 1395dd(b) and (c). J.A. at 367. Roberts argues that there is no requirement of actual knowledge under these branches of the EMTALA statute, and alternatively, that there is no requirement that the physicians have actual knowledge — just that the hospital have actual knowledge. Both of these claims, however, do not succeed.

### 1. Actual Knowledge

Roberts's first claim is that the district judge erroneously imported an actual-knowledge requirement into the jury instructions. The EMTALA statute, 42 U.S.C. § 1395dd, has three main sections. Section (a) requires hospitals to provide appropriate medical screening examinations to those who come to emergency rooms. Section (b) requires hospitals to stabilize patients who have emergency medical conditions or who are in labor, or to transfer them only in accordance with section (c). Section (c) generally prohibits transfers without a written request and waiver by the patient, a signed physician certification, or a qualified medical person's certification after consultation with a physician.

This court has long held that liability under section (b) requires actual knowledge of the condition. *See Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990). Section (b) explicitly states that the duty to stabilize patients only arises when "the hospital determines that the individual has an emergency medical condition." 42 U.S.C. § 1395dd(b)(1). This court in *Cleland* interpreted that sentence to require "actual knowledge of the doctors on duty or those doctors that would have been provided to any paying patient." *See Cleland*, 917 F.2d at 268-69. Every other circuit to consider the question has also required actual

knowledge.[2] *See Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1257 (9th Cir. 2001); *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1140 (8th Cir. 1996); *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996); *Urban v. King*, 43 F.3d 523, 525-26 (10th Cir. 1994); *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991).

Roberts suggests that section (c) should not be interpreted as requiring actual knowledge. She reads EMTALA as creating three separate duties, one each under sections (a), (b), and (c). As a result, Roberts argues that the actual knowledge requirement that we implied in section (b) should not attach to section (c). For support, she cites a Virginia Supreme Court case that adopts a separate-duty interpretation. *See* Appellant Br. at 22 (citing *Smith v. Richmond Mem'l Hosp.*, 416 S.E.2d 689 (Va. 1992)). Roberts ignores the fact that this circuit has previously established that sections (b) and (c) are to be read together, creating only a single duty on the part of the hospital to stabilize patients who have emergency medical conditions before they may be transferred. *See Cleland*, 917 F.2d at 268. The *Cleland* court construed EMTALA as imposing two sets of duties on hospitals, one set coming from section (a) (the medical screening provision) and the other coming from the interplay of sections (b)(1) and (c)(1) (the stabilization and the transfer-restriction provisions). *Id.* at 268. Our later cases have also treated section (a) as creating liability for failing to appropriately screen patients, and sections (b) and (c) as together regulating treatment and restricting transfer of emergency patients. *See, e.g.*,

---

[2] In *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249 (1999), the Supreme Court struck down the Sixth Circuit's requirement that a plaintiff had to show "improper motive" for liability under section (b). In a footnote, the Supreme Court stated that it would not consider whether actual knowledge was required for liability. *See id.* at 253 n.2 (expressing "no opinion as to the factual correctness or legal dispositiveness of" the claim that the defendant "did not have actual knowledge of the patient's condition").

*Cherukuri v. Shalala*, 175 F.3d 446, 450 (6th Cir. 1999). The Ninth Circuit has noted that Roberts's interpretation is the minority position and cites our circuit has having opposed that interpretation:

> All four other circuits to consider this or related questions have held that there is no liability under subsection (c) unless there has been a determination under subsection (b). *Baber v. Hospital Corp. v. America*, 977 F.2d 872, 883 (4th Cir. 1992); *Urban v. King*, 43 F.3d 523, 525-27 (10th Cir. 1994); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991); *see also Cleland v. Bronson Health Care Corp.*, 917 F.2d 266, 271 (6th Cir. 1990). The Virginia Supreme Court has reached a contrary conclusion, by reading the subsections in the disjunctive as Ms. James urges. *Smith v. Richmond Memorial Hospital*, 243 Va. 445, 416 S.E.2d 689, 692 (1992).

*James v. Sunrise Hosp.*, 86 F.3d 885, 889 (9th Cir. 1996) (joining the majority position and explaining why the language of the statute itself requires this position). This court has previously rejected Roberts's disjunctive reading of sections (b) and (c). As a result, the actual knowledge requirement that *Cleland* held necessary for section (b) attaches to section (c), and the district court was correct to require a showing of actual knowledge.

### 2. The Actual-Knowledge Instruction

Roberts also claims that, assuming that the requirement of actual knowledge was proper, the instruction was erroneous because it required the jury to find that the physicians themselves had actual knowledge of the emergency medical condition. Roberts claims that liability under the statute should attach if any hospital employee had knowledge of the emergency medical condition, not just a physician.

"This circuit has set a high standard for reversal of a conviction on the grounds of improper instructions." *United*

*States v. Sheffey*, 57 F.3d 1419, 1429 (6th Cir. 1995), *cert. denied*, 516 U.S. 1065 (1996). "Our inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *United States v. Wells*, 211 F.3d 988, 1002 (6th Cir. 2000). "This court may reverse a judgment on the basis of improper jury instructions only if the instructions, when viewed as a whole, were confusing, misleading and prejudicial." *Id*.; *see also Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000) (stating that "[w]e will not reverse a decision on the basis of an erroneous jury instruction where the error is harmless").[3]

---

[3] We note that this court has not been altogether consistent on the standard for overturning erroneous jury instructions. According to Westlaw, there have been forty-two cases in which we have stated that we will overturn jury instructions only if they are "confusing, misleading, *and* prejudicial." *See, e.g.*, *United States v. Kone*, 307 F.3d 430, 435 (6th Cir. 2002) (italics added). However, again according to Westlaw, there have been eighty cases where we have stated that we will overturn jury instructions when they are "confusing, misleading, *or* prejudicial." *See, e.g.*, *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 351 (6th Cir. 2002) (italics added). This semantic difference has real importance in this context, where we recognize that the jury instructions below were confusing and misleading (indeed, they were flatly incorrect), but not prejudicial.

To set the record straight, this court has required a showing of prejudice to overturn erroneous jury instructions; the correct version of the standard is "confusing, misleading, *and* prejudicial." This phrase first appeared in our decision in *DSG Corp. v. Anderson*, 754 F.2d 678 (6th Cir. 1985), where we ordered a new trial because "the instructions viewed as a whole were confusing, misleading, and prejudicial." *Id.* at 679. This phrase became a standard in *Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004 (6th Cir. 1987), where we stated generally that "[a] judgment can be reversed if the instructions, viewed as a whole, were confusing, misleading and prejudicial." *Id.* at 1011. Confusion was introduced, however, in *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71 (6th Cir. 1990), when this court made an apparently typographic mistake in citing *Kitchen*, reporting the standard as being "confusing, misleading, or prejudicial." *Id.* at 72-73.

We now correct the mistake we made in *Beard*. We note that this correction will almost certainly not change the practice of our circuit in

The jury instructions in this case required the jury to determine whether "[t]he physician responsible for her transfer had actual knowledge of that condition." J.A. at 367. Roberts objects to this instruction, claiming that EMTALA requires only that the hospital, not necessarily the attending physician, have knowledge of the condition. Roberts argues that the jury instruction effectively shielded Galen from EMTALA liability for the participation of its social workers, nursing staff, and administration.

Roberts is correct; the jury instructions were erroneous. The language of EMTALA clearly implies that Galen is responsible not only for the actions of its doctors, but also for the actions of its other employees. The EMTALA statute, in all its sections, refers to the obligations of hospitals, rather than physicians. For example, the statute plainly states that a duty arises under section (b) if an individual "comes to a hospital and *the hospital* determines that the individual has an emergency medical condition." 42 U.S.C. § 1395dd(b)(1) (italics added). As a result, the jury instructions incorrectly suggested that the hospital was only liable if the physician responsible for her transfer knew about the condition. In *Cleland*, this court interpreted "the vague phrase 'emergency medical condition' to mean a condition within the actual knowledge of the doctors on duty or those doctors that would have been provided to any paying patient." *Cleland*, 917 F.2d at 268-69. This statement would seem to suggest that Galen is not responsible for emergency medical conditions unknown

---

any significant way. Many of the cases that have used the "confusing, misleading, or prejudicial" standard have ultimately required prejudice in a roundabout way, generally by requiring that the error not be harmless. By insisting that an error in jury instructions have harmed a party's case before reversal can be ordered, errors that are not prejudicial to any party cannot be the basis for reversal. Thus, even the "confusing, misleading, or prejudicial" standard has been interpreted to require both an error in jury instructions and resulting prejudice before reversal is justified. *See, e.g.*, *Toth*, 306 F.3d at 351-52 (relying on *Beard* and using the "confusing, misleading, or prejudicial" standard, yet refusing to reverse because the error was harmless).

to their doctors, even if they were known by another of Galen's employees or agents. This, however, is classic dicta; the *Cleland* court was not considering a case where some hospital employee or agent knew of a patient's emergency medical condition without a physician knowing about it — the doctor in *Cleland* was apparently the only one who ever saw the patient. *See Cleland*, 917 F.2d at 269. As a result, the language of *Cleland* limiting a hospital's responsibility to the responsibility for emergency medical conditions within the actual knowledge of its doctors (as opposed to its employees or agents more generally) is not binding on us, and we, upon analysis, find it unpersuasive. We instead believe that any hospital employee or agent that has knowledge of a patient's emergency medical condition might potentially subject the hospital to liability under EMTALA.

Having established error in the instructions, Roberts cannot, however, prove prejudice. Logically, such prejudice might exist if Johnson were transferred despite another hospital employee knowing that she had an emergency medical condition without her attending physician having known it. In theory, this is quite possible. For example, it is conceivable that, under some circumstances, a nurse could know details of a patient's situation constituting an emergency medical condition, thereby triggering the hospital's obligations under EMTALA, without the transferring physician being aware of the situation.

Here, however, the attending physician, Dr. Abou-Jaoude, knew of all the pertinent facts about Johnson's condition before ordering the transfer. The nurse on duty at the time of the transfer, Karen Martin, explicitly testified that she informed Dr. Abou-Jaoude of all of Johnson's symptoms. She also wrote on Johnson's medical chart, "Dr. A.J. aware," because she wanted to make sure that Dr. Abou-Jaoude as the attending physician had all of the relevant information to make the decision as to whether to transfer Johnson. J.A. at 456C-456D. Roberts does not even allege that someone in the hospital had some knowledge of Johnson's condition that

Dr. Abou-Jaoude lacked. As it is clear that the deficient jury instructions did not prejudice Johnson, we accordingly will not reverse the district court's judgment on the basis of the jury instructions.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment. As all of the plaintiff's assignments of error fail, we need not consider Galen's alternative argument that it was entitled to judgment as a matter of law.

_____

**CONCURRENCE**

_____

ALICE M. BATCHELDER, Circuit Judge, concurring. I write separately because, although I do not disagree with either the reasoning of the lead opinion or its conclusions with regard to the issues it addresses, I would not reach those issues. Galen contends in its cross-appeal that the district court should have granted its motion for judgment as a matter of law, and this case should never have gone to the jury. In my view, we ought to address Galen's assignment of error first, and if, as I believe we must, we conclude that the district court erred in denying the motion, we would not reach the issues surrounding the jury verdict.

A district court may grant a motion for judgment as a matter of law if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue . . . ." Fed. R. Civ. P. 50(a). This court, "viewing the evidence in the light most favorable to the nonmovant," reviews de novo the district court's decision whether to grant the motion. *Diamond v. Howd*, 288 F.3d 932, 935 (6th Cir. 2002).

As a matter of law, the plaintiff had to show that Roberts was transferred from the University of Louisville Hospital at a time when she had "an emergency medical condition which ha[d] not been stabilized." 42 U.S.C. § 1395dd(c)(1). An emergency medical condition

> manifest[s] itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>   (i) placing the health of the individual . . . in serious jeopardy,
>   (ii) serious impairment to bodily functions, or

> (iii) serious dysfunction of any bodily organ or part . . . .

§ 1395dd(e)(1)(A). After reviewing the record thoroughly and construing the evidence in a light most favorable to the plaintiff, I have found no evidence to support the conclusion that Roberts, at the time of her transfer, was suffering from an "emergency medical condition" as defined by the EMTALA. While the hospital's decision to transfer Roberts may have been unwise, or perhaps even negligent, the hospital did not have a continuing duty *under the EMTALA* to care for Roberts when she no longer required immediate medical attention.