**Clair D. CLELAND, Jr. and Janet Cleland, Co–Personal Representatives of the Estate of Clair Devern Cleland, III, Plaintiffs–Appellants,**

v.

**BRONSON HEALTH CARE GROUP, INC., a Michigan Corporation, Bronson Methodist Hospital, a Michigan Corporation, Individually and Doing Business as South–Western Michigan Trauma and Emergency Center of Bronson and Expresscare, and Southwestern Michigan Emergency Service, P.C., a Michigan Professional Corporation, Defendants–Appellees.**

No. 89–1627.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 23, 1990.

Decided Oct. 24, 1990.

Rehearing and Rehearing En Banc Denied Dec. 6, 1990.

Paul L. Nelson (argued), Tolley, Fisher & Verwys, Grand Rapids, Mich., for plaintiffs-appellants.

Jon D. Vander Ploeg (argued), Lance R. Mather, William W. Jack, Smith, Haughey, Rice & Roegge, F. William McKee, Joel S. Huyser, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, Mich., for defendants-appellees.

Before: KENNEDY and BOGGS, Circuit Judges; and HULL, Chief District Judge.[*]

BOGGS, Circuit Judge.

The Clelands took their 15–year–old son to the Bronson Methodist Hospital emergency room in Kalamazoo, Michigan, complaining of cramps and vomiting. He was examined by a doctor of the defendant Bronson Health Care Group, who diagnosed influenza and, four hours later, discharged the patient. Unfortunately, this diagnosis was incorrect. Young Cleland was actually suffering from intussusception, where a part of the intestine telescopes within itself. Less than 24 hours later, he suffered cardiac arrest and died. Instead of limiting themselves to the perhaps expected medical malpractice action, the parents of the deceased creatively also looked to a 1986 Congressional enactment, the Emergency Medical Treatment and Active Labor Act, ("the Act") 42 U.S.C. § 1395dd. The Act imposes on hospitals such as this one the following duties:

(1) To provide "an appropriate medical screening examination within the capability of the hospital's emergency department" to "any individual [who] comes to the emergency department" and seeks examination or treatment. 42 U.S.C. § 1395dd(a).

(2) If the "hospital determines that the individual has an emergency medical condition," to stabilize the medical condition before transferring (or discharging) a patient. 42 U.S.C. § 1395dd(b)(1) and (c)(1).

It is undisputed that the impetus to this legislation came from highly publicized incidents where hospital emergency rooms allegedly, based only on a patient's financial inadequacy, failed to provide a medical screening that would have been provided a paying patient, or transferred or discharged a patient without taking steps that would have been taken for a paying patient. Apparently dissatisfied with the effect of laws that had been limited to hospitals that received funds from the government under the Hill–Burton Act, 42 U.S.C. §§ 291 to 291 o –1, Congress chose to attempt to meet the perceived evil by enacting the quoted language. *See* 1986 *U.S. Code Cong. & Admin.News* 42, 579, 605; *Note, Preventing Patient Dumping*, 61 N.Y.U.L.Rev. 1186, 1187–88 and nn. 11–12 (1986).

The district court noted this legislative history and found that it was unlikely that Congress intended for § 1395dd to be used as a general malpractice action, because this statute addresses concerns about indigent patients rather than bringing within its ambit all unfortunate consequences that occurred to any and all patients. The district court therefore dismissed the complaint under Rule 12(b)(6), Federal Rules of Civil Procedure, based on its interpretation that the Act applied only to indigent and uninsured patients. We affirm the district court, though on different grounds. *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir.1985).

We hold Congress to its words, that this statute applies to any and all patients. However, we interpret the vague phrase "appropriate medical screening" to mean a screening that the hospital would have offered to any paying patient, and the vague phrase "emergency medical condi-

[*] The Honorable Thomas G. Hull, United States District Judge for the Eastern District of Tennessee, sitting by designation.

tion" to mean a condition within the actual knowledge of the doctors on duty or those doctors that would have been provided to any paying patient. Since the plaintiffs make no allegations that would allow a finding that either of the statutory duties was breached, we affirm the district court's dismissal of this case.

## I

At 11:30 p.m. on October 28, 1986, Clair Cleland Jr. and Janet Cleland took their fifteen-year-old son, Clair III, to the Southwestern Michigan Trauma and Emergency Center[1] complaining of lower abdominal cramps and vomiting. He was examined by Dr. Beth Armstrong, who diagnosed Clair as suffering from gastroenteritis (influenza) with dehydration and hypoglycemia. Approximately four hours after his arrival, in the early morning of October 29, Clair was discharged to his parents with instructions for his care.

At approximately 10:30 p.m. that same night, Clair was returned to the Trauma Center experiencing cardiopulmonary arrest. He was pronounced dead at approximately 11:45 p.m.

The Clelands filed this action on May 16, 1988, alleging that defendants failed to provide for an appropriate medical screening, failed to treat Clair's emergency medical condition, and discharged Clair without stabilizing his condition, all in violation of the Act. The trial court dismissed their suit for failure to state a claim under the Act because Clair was not indigent and was not uninsured. This appeal followed.

## II

### A

■ There was no indication or allegation that the care provided to young Cleland, and the decision to discharge him were based on anything other than the best medical judgment of those employed by the hospital. There is no allegation that the screening was in any way different than

would have been offered to any other patient, or was deficient in any way peculiar to the patient's characteristics. The allegation of "failure to stabilize" before discharge is similarly based only on the outcome. Appellants point to nothing that indicates that the patient's condition at discharge would not have been considered stable for any other patient, nor is there any allegation of any facts known to the doctors at the time to imply that the patient was not stabilized.

As noted above, there is nothing in the legislative history showing that Congress had any concern about the treatment accorded any patients other than the indigent and uninsured. Thus, defendants argue that Congress could not have intended to allow anyone else to sue under the Act. Unfortunately for this theory, Congress wrote a statute that plainly has no such limitation on its coverage. Just as the Supreme Court has frequently held that the existence of a widespread evil does not mean that Congress must address all of it at once, but it may address it piecemeal, *see Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955), there is no principle of construction that Congress may not similarly write a statute that is far broader than any area of concern that it has conceived of or has had brought to its attention. "[T]he law need not be in every respect logically consistent with its aims to be constitutional." *Id.* at 487–88, 75 S.Ct. at 464–65.

While the legislative history might be of assistance in interpreting ambiguous words or phrases of limitation, there are simply none in this language. The benefits and rights of the statutes extend "to any individual" who arrives at the hospital. The ambiguous words that do exist: ("appropriate" and "stabilize") do not serve to exclude completely any person from the coverage of the Act. Thus, we must reject the grounds chosen by the district court, and

---

**1.** Southwestern Michigan Trauma and Emergency Center is alleged to be the assumed name under which Bronson Methodist Hospital and Bronson Health Care Group offer emergency services.

argued by the defendants, for dismissing the plaintiffs' claim.

We note that a number of courts have, in dicta, indicated that the Act was meant to apply only to the indigent and uninsured: *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1132 (6th Cir.1990) ("The Act requires hospitals to give emergency aid to indigent patients"); *Thompson v. St. Anne's Hosp.*, 716 F.Supp. 8, 10 (N.D.Ill. 1989) (statute aimed at preventing hospitals both from transferring and simply rejecting indigent patients); *Reid v. Indianapolis Osteopathic Medical Hosp.*, 709 F.Supp. 853 (S.D.Ind.1989) (statute designed to prevent hospitals turning patients away because of inability to pay); *Bryant v. Riddle Memorial Hosp.*, 689 F.Supp. 490, 492 (E.D.Pa.1988) (Act intended to address the problem of patient dumping). However, in none of those cases was a claimant excluded simply because the claimant was not indigent or uninsured, so our issue was not faced directly.

Three district courts, however, have ruled squarely on the issue before us. *Stewart v. Myrick*, 731 F.Supp. 433 (D.Kan.1990), and *Evitt v. University Heights Hosp.*, 727 F.Supp. 495 (S.D.Ind. 1989), on which *Stewart* relied heavily, hold that the Act does not cover a situation that "does not represent a case of patient dumping, in which the plaintiff was turned away from medical care for economic reasons." *Stewart*, 731 F.Supp. at 436. *Evitt* holds that "[c]laims regarding diagnosis and treatment lie in the area of medical malpractice, an area traditionally regulated by state law." *Evitt*, 727 F.Supp. at 497.

In the very recent case of *DeBerry v. Sherman Hosp. Assoc.*, 741 F.Supp. 1302 (N.D.Ill.1990), the court explicitly considered the same type of arguments as those presented in our case, and held that a claim could be stated under the Act where the patient did not allege that the denial of treatment was based on inability to pay. We find the reasoning in this case to be persuasive. It specifically takes account of the *Stewart* and *Evitt* cases, but holds that the text must control over the legislative history. In addition, *Evitt* and *Myrick* ar-

gue that 42 U.S.C. § 1395dd has a very strong preemptive effect, and that Congress could not have intended to extend such preemptive power so far. However, as *DeBerry* persuasively points out, the Act has no such preemptive power. In fact, in this case, as in most others brought under the Act, state law malpractice claims have been joined with the claim under the Act. *See* 42 U.S.C. § 1395dd(f), specifically negating preemption, except where affirmatively mandated.

Reams of citations can be provided on either side of the dichotomy that:

(a) courts should follow the plain words of the statute; *see, e.g. United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961); *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 106 (D.C.Cir.1976); and

(b) courts should not follow the plain words of the statute if it would lead to an absurd result; *see, e.g., Wilderness Soc. v. Morton*, 479 F.2d 842, 855 (D.C.Cir.) (en banc), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

Here, however, we do not need to make a dramatic choice between the two canons of construction. The words of the statute on basic eligibility are quite plain, and interpreting them as such does not lead to an absurd result. It leads to a result considerably broader than one might think Congress should have intended, or perhaps than any or all individual members of Congress were cognizant of. However, it is not our place to rewrite statutes to conform with our notions of efficacy or rationality. That is the job of Congress. It is only where the language that Congress uses admits of varying interpretations that secondary means of interpretation come into play. Here, the result we reach in no way vitiates or is contrary to Congress's indicated concern in passing the legislation. It may go further than what Congress contemplated, but that is not a reason to distort or excise the words that Congress wrote.

## B

■ However, Congress did limit the cause of action provided by the Act to only those who did not receive an "appropriate" screening or who were not "stabilized" before being transferred or discharged. In attempting to interpret those ambiguous phrases, we can look to legislative history, along with other aids to construction.

"Appropriate" is one of the most wonderful weasel words in the dictionary, and a great aid to the resolution of disputed issues in the drafting of legislation. Who, after all, can be found to stand up for "inappropriate" treatment or actions of any sort? Under the circumstances of the act, "appropriate" can be taken to mean care similar to care that would have been provided to any other patient, or at least not known by the providers to be insufficient or below their own standards. Plaintiffs essentially contend that "appropriate" denotes, at a minimum, the full panoply of state malpractice law, and at a maximum, includes a guarantee of successful result.

In one sense, in hindsight, the screening provided in this case could scarcely be called appropriate. The patient came in, he had a condition that was at least conceivably ascertainable by medical science, the condition was not ascertained, and he died within 24 hours. At the same time, there is not the slightest indication that this outcome would have been any different for a patient of any other characteristics. Had his sex, race, national origin, financial condition, politics, social status, etc., been anything whatsoever, as far as can be gleaned from the complaint, the outcome would have been the same. Under these circumstances, we hold that the complaint simply fails to allege any inappropriateness in the medical screening in the sense required by the Act.

■ The same reasoning applies to stabilization, though with even greater force. To all appearances, the plaintiff's condition was stable. He was not in acute distress, neither the doctors nor the patient or his parents made the slightest indication that the condition was worsening in any way, or that it presented any risk that might become life-threatening, or that it would worsen markedly by the next day.

Again, in hindsight, any stability was quite short-run. The patient died. However, neither the normal meaning of stabilization, nor any of the attendant legislative history or apparatus, indicates that Congress intended to provide a guarantee of the result of emergency room treatment and discharge. In the hospital's opinion, the patient was stable, and they would have believed that a patient with any differing characteristics would have been stable. We therefore hold that within the meaning of the Act the hospital did its duty to stabilize young Cleland, and there are no allegations in the complaint to the contrary. Therefore, dismissal under Rule 12(b)(6) is proper.

In the *DeBerry* case, the district court rejected a motion to dismiss for failure to state a claim similar to that in this case, and allowed the case to proceed. The court's decision contains little analysis of the meaning of the words "appropriate" or "failing to stabilize." What little it does contain is not contrary to our decision here. The court in *DeBerry* states that there are:

> "two primary ways in which a hospital can violate section 1395dd through the operation of its emergency room[:] ... (1) by failing to detect the nature of the emergency condition through inadequate screening procedures under subsection (a), or,
> (2) under subsection (b), if the emergency nature of the patient's condition is detected, by failing to stabilize the condition before releasing the plaintiff."

*DeBerry*, at screens 7–8.

■ This discussion of subsection (b) is consistent with our analysis. If the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition[2].

---

**2.** In *Thornton*, 895 F.2d at 1134, our circuit stated that "[o]nce a patient is *found* to suffer from an emergency medical condition, the hospital must give the patient treatment to stabilize

With regard to subsection (a), the court does not go into the question of what constitutes inadequate screening procedures in its terms. We believe that the terms of the statute, specifically referring to a medical screening exam by a hospital "within its capabilities" precludes resort to a malpractice or other objective standard of care as the meaning of the term "appropriate." Instead, "appropriate" must more correctly be interpreted to refer to the motives with which the hospital acts. If it acts in the same manner as it would have for the usual paying patient, then the screening provided is "appropriate" within the meaning of the statute.

## III

This result does not constitute a backdoor means of limiting coverage to the indigent or uninsured. A hospital that provides a substandard (by its standards) or nonexistent medical screening for any reason (including, without limitation, race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc.) may be liable under this section. Similarly, a discharge that to the knowledge of those conducting it left a patient with an "emergency medical condition" in an "unstable" condition would be actionable.

We can think of many reasons other than indigency that might lead a hospital to give less than standard attention to a person who arrives at the emergency room. These might include: prejudice against the race, sex, or ethnic group of the patient; distaste for the patient's condition (*e.g.*, AIDS patients); personal dislike or antagonism between the medical personnel and the patient; disapproval of the patient's occupation; or political or cultural opposition. If a hospital refused treatment to persons for any of these reasons, or gave cursory treatment, the evil inflicted would be quite akin to that discussed by Congress in the legislative history, and the patient would fall squarely within the statutory language. On the other hand, if, as appears

to be the case here (and as is not contradicted in the pleading), a hospital provides care to the plaintiff that is no different than would have been offered to any patient, and, from all that appears, is "within its capability" (that is, constitutes a good faith application of the hospital's resources), then the words "appropriate medical screening" in the statute should not be interpreted to go beyond what was provided here.

The judgment of the district court dismissing this case is AFFIRMED.

---

that condition...." (emphasis added). This statement, though dicta, is also consistent with our holding: If the condition was not ascer-

tained even though an appropriate screening was provided, then the hospital could not have violated its duty to stabilize.