# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-3373

RICHARD THOMAS, individually
and as Special Administrator of
the Estate of Chyrl Thomas,

*Plaintiff-Appellant*,

*v.*

CHRIST HOSPITAL AND MEDICAL CENTER,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 700—**James B. Zagel**, *Judge*.

ARGUED FEBRUARY 25, 2003—DECIDED APRIL 25, 2003

Before POSNER, COFFEY, and WILLIAMS, *Circuit Judges*.

COFFEY, *Circuit Judge*.    Plaintiff-Appellant Richard Thomas ("Thomas") sued Defendant-Appellee Christ Hospital and Medical Center (the "Hospital"), alleging that the Hospital had failed to fulfill its duty to stabilize his wife, Chyrl Thomas ("Chyrl"), before releasing her, as required by the Emergency Medical Treatment and Active Labor Act ("EMTALA"). The district court granted the Hospital's motion for summary judgment, and Thomas appeals. We reverse.

## I. FACTUAL BACKGROUND

On Friday evening, July 9, 1999, Richard Thomas brought his wife, Chyrl, to the Hospital's emergency room. Richard explained to the Hospital's staff that Chyrl had been exhibiting strange behavior recently, including crying profusely, driving recklessly, and talking rapidly and incoherently. After the staff obtained medical histories and performed independent evaluations of Richard and Chyrl, it was determined that Chyrl was in need of further psychiatric evaluation.

Chyrl was assessed by several members of the Hospital staff. Initially, Chyrl was evaluated by Leonard Kemp, a licensed clinical staff social worker specializing in psychiatric assessments with some thirty years experience. Kemp was charged with assessing and making recommendations of psychiatric referrals, where appropriate, for emergency room patients.

Kemp noted that Chyrl showed manic-like symptoms, was deeply agitated, and was "extremely paranoid towards her husband" (*i.e.*, she had refused to go to sleep for the previous four days because she thought her husband was going to kill her). (R. 96-2 at 51, 60.) He observed that Chyrl was uncooperative, guarded, and belligerent. (R. 96-2 at 102.) She exhibited psychomotor agitation by pacing, refusing to stay on the cart, and leaving the examination room. (R. 96-2 at 105.) Kemp also noted that Chyrl could not stay on one subject and was emotionally labile. (R. 96-2 at 51-52, 62.) He recorded the fact that Chyrl had started ingesting a steroid (prednisone) for the treatment of respiratory distress within the previous two weeks and was presently taking such medication. Based on his observations and knowledge, Kemp concluded that Chyrl suffered from a steroid-induced psychosis. (R. 96-2 at 52.)

Kemp noted that Chyrl required treatment for her erratic and unpredictable behavior, and that there was a pos-

sibility that Chyrl might "act out" against her husband. (R. 96-2 at 59.) Using a scale of 1 to 10 (1-no need for hospitalization, 10-hospitalization absolutely required), Kemp rated Chyrl at 5.5, meaning that he slightly favored hospitalization. (R. 96-2 at 60.) After determining that the Hospital's psychiatric ward presently had no beds available, Kemp recommended that Chyrl either be admitted in a different part of the hospital or be transferred to another facility. (R. 96-2 at 54, 64.) When he left work a short time after he evaluated Chyrl, Kemp was under the impression that Chyrl would either be admitted medically or transferred to a psychiatric hospital, having made such a recommendation to the emergency room resident, Dr. Belden: "[S]ee if you can get a medical admit with a psych consult. . . . If that doesn't work, she needs to be transferred to a psych hospital." (R. 96-2 at 48, 50.)

Chyrl was next evaluated by Dr. Eleanor Levine, an attending emergency room physician. Dr. Levine concurred with Kemp's diagnosis of steroid-induced psychosis, but opined that Chyrl did not pose a threat of harm to herself or others. Despite Dr. Levine's conclusion that Chyrl did not pose a threat of harm to herself or others, the Hospital offered Chyrl voluntary commitment into the hospital, which Chyrl declined. Chyrl was instructed by Dr. Levine to immediately discontinue the use of the prednisone and to make an appointment as soon as possible with Dr. Palmer (Chyrl's personal physician, who had initially prescribed the prednisone). Levine also advised Chyrl to return to the emergency room if her condition worsened. After relaying these instructions to Chyrl's family, the Hospital staff discharged Chyrl around midnight Friday, July 9, 1999.

On Monday, July 12, Chyrl went to see Dr. Palmer, again accompanied by her husband, Richard. After evaluating Chyrl, Dr. Palmer formulated a treatment plan including a sedative medication and instructed Chyrl not to drive.

That evening, Chyrl and Richard went to dinner and a movie. While sitting in the theatre before the movie began, Chyrl got up from her seat and, without saying anything to Richard, exited the theatre. Richard was under the impression Chyrl had simply gone to the restroom. Unfortunately, however, Chyrl had actually left the building and was in the process of driving northbound on Chicago's Michigan Avenue reaching speeds in excess of eighty miles per hour. At 91st Street, a "T" intersection requiring traffic north on Michigan Avenue to make a left or right turn, Chyrl continued straight ahead. She was fatally injured when her car struck a light pole and a building. She was pronounced dead shortly after she arrived at Christ Hospital late Monday night (around 11:00 p.m.), July 12.

On February 4, 2000, Richard Thomas, individually and as Special Administrator of Chyrl's estate, filed a complaint in district court. After multiple amendments and dismissals, only Count I against Christ Hospital, based on violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), survives and is under review by this Court. On April 10, 2002, the Hospital filed a motion for summary judgment requesting dismissal of Count I, alleging that there was no genuine issue of material fact as to whether Christ Hospital discharged Chyrl Thomas with an unstable emergency medical condition. The district court granted summary judgment in the Hospital's favor on September 3, 2002. Thomas filed a timely notice of appeal in September, 2002.

## II. ANALYSIS

Summary judgment should be granted only if there is "no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). We review a grant of summary judgment *de novo*, construing all the facts in the light most favorable to the nonmoving party. *Harley-*

*Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 980 (7th Cir. 2003). Conclusory allegations alone cannot defeat a motion for summary judgment. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

The EMTALA imposes two primary obligations on certain federally funded hospitals.[1] First, when an individual seeks treatment from an emergency room, the hospital must provide for an "appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). Second, if the hospital determines that the individual has an emergency medical condition, then the hospital must either "stabilize" the medical condition or must arrange for the transfer of the individual to another medical facility. 42 U.S.C. § 1395dd(b)(1).

"Emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity that the absence of immediate medical attention could reasonably result in "imminent danger of death or serious disability." 42 U.S.C. § 1395dd(e)(1); *Thorton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir. 1990). The Federal Regulations promulgated by the Health Care Financing Administration, Department of Health and Human Services ("HCFA") further define an "emergency medical condition" as a medical condition of sufficient severity as to include not only severe pain, but also a psychiatric disturbance and/or symptoms of substance abuse. 42 C.F.R. § 489.24(b)(i). Under the HCFA Interpretive Guidelines § 489.24(c)(1), if "it is determined that the patient has reached the point where his/her continued care, including diagnostic workup and/or treatment, could be reasonably performed as an outpatient or later as an

---

[1] The Hospital does not dispute that it falls under EMTALA's ambit.

inpatient, provided the patient is given a plan for appropriate follow-care with the discharge instructions," a patient will be considered stabilized for discharge.

Christ Hospital does not dispute that Chyrl had an "emergency medical condition" under EMTALA. Rather, the Hospital argues that Chyrl's condition was stable at the time she was discharged, and thus the requirements of EMTALA were met. The EMTALA defines "stabilized" as a state in which "no material deterioration of the condition is likely, within reasonable medical probability, to result." § 1395dd(e)(3)(B). The HCFA's Interpretive Guidelines, which the Hospital admits define "stability" as far as Chyrl was concerned, provide that a psychiatric patient is considered to be "stable when he/she is no longer considered to be a threat to him/herself or to others."

In assessing the physical stability of a patient, courts have generally focused on the EMTALA requirement that "no material deterioration" of the condition is likely. *See, e.g.*, *St. Anthony Hosp. v. United States Dep't of Health and Human Services*, 309 F.3d 680, 697 (10th Cir. 2002); *Harry v. Marchant*, 291 F.3d 767, 771 (11th Cir. 2002); *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1167 (9th Cir. 2002). Several Circuit Courts have also addressed the applicability of EMTALA to psychiatric, not physical, conditions. *See, e.g.*, *Eberhardt v. City of Los Angeles*, 62 F.3d 1253 (9th Cir. 1995); *Power v. Arlington Hospital Ass'n*, 42 F.3d 851 (4th Cir. 1994). However, these psychiatric EMTALA cases deal principally with the EMTALA-imposed screening requirements that a hospital must employ to detect emergency medical conditions, not the EMTALA stabilization requirement. *See Eberhardt*, 62 F.3d at 1257; *Power*, 42 F.3d at 859. The adequacy of the Hospital's screening procedure is not at issue here. Rather, the question is whether, during the screening, the Hospital became aware that Chyrl was unstable and nevertheless released her. Once an emergency medical condition

is detected, the hospital must act to stabilize the condition—whether physical or psychiatric—before the patient can be transferred or released. 42 U.S.C. § 1395dd.

Thomas argues that an issue of material fact exists as to whether Chyrl was psychiatrically "stabilized" under the EMTALA when released. First, he contends that the medical expert testimony presented during pre-trial discovery established a genuine issue as to Chyrl's stability and was a danger to others or herself. Second, he avers that the deposition testimony of Leonard Kemp, the hospital staff social worker, created a genuine issue as to Chyrl's stability.

Thomas retained two expert witnesses who testified as to the propriety of Chyrl's discharge. Dr. Thomas Zane reported that "a diagnosis of psychosis with documented paranoia, impaired judgment and thinking process represents an unstable condition," and that "a diagnosis of psychosis indicates that a patient has an inability to distinguish reality from non-reality." In reaching his conclusion that Chyrl "should have been transferred to a facility with . . . resources for patients with acute psychosis," Dr. Zane stated that Chyrl "could not have taken responsibility for her own actions and could not have signed as the responsible person for her own discharge and was, by definition, a danger to herself regardless of assurances to the contrary." He also testified that although he may not have foreseen that Chyrl Thomas would have been killed while operating a motor vehicle, he would have anticipated that Chyrl might very well have done something unreasonable and would have been a significant danger to herself or others.

Dr. Leonard Elkun, a psychiatrist, also testified that Chyrl should not have been discharged. Rather, if the Hospital was unwilling to admit Chyrl, at the very least she should have been prescribed anti-psychotic medica-

tion to combat the symptoms of steroid-induced psychosis. She should have been directed to follow up with a psychiatrist—if not immediately, as soon as practically possible—rather than to merely follow up with her internist, Dr. Emeric Palmer, who had prescribed her the prednisone.

Thomas' first argument, standing alone, is not convincing. Despite the fact that he presented the testimony of two medical experts (Drs. Zane and Elkun), it is clear that conclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990) (citations omitted). Rule 56(e) of the Federal Rules of Civil Procedure specifically prohibits a party from relying upon his allegations to contest entry of summary judgment. Neither Zane nor Elkun set forth any specific facts to support their respective opinions that Chyrl Thomas was discharged in an unstable medical condition (prednisone-induced psychosis) or left with the same unstable condition.

Thomas' second argument, however, carries more weight. The testimony of the Hospital's staff social worker, Kemp, lends factual support to the expert opinions. Kemp, who was the one primarily responsible for psychiatric intake screening at the Hospital on the night in question, (R. 96-2 at 34), stated that he slightly favored hospitalizing Chyrl because he feared that Chyrl would "act out" against her husband because of her unstable mental condition. In other words, Kemp considered Chyrl to be a threat to her husband and thought that she should be either admitted or transferred to another hospital. As noted *supra*, however, Kemp was the hospital employee who recorded his professional observations that Chyrl showed manic-like symptoms and had refused to go to sleep for the previous four days because she thought her husband was going to kill her. He also observed that Chyrl was uncooperative, guarded,

and belligerent; that she refused to stay on the examination cart, was constantly pacing, and attempted to leave the examination room. It was on the basis of these observations that he recommended Chyrl either be admitted or transferred to a psychiatric hospital.

Under the HCFA Guidelines § 489.24(c)(1), which the Hospital admits applies to this case, a psychiatric patient has been stabilized only if he is no longer a threat to himself or others. The Hospital dismisses Kemp's opinion that Chyrl was not stable because she was a threat to her husband because Kemp expressly stated that he did not feel that Chyrl was suicidal or homicidal. The same reasoning was adopted by the district court. In reaching this conclusion, the Hospital and the district court have apparently inserted the modifying phrase "suicidal or homicidal" before the word "threat" in HCFA Guideline § 489.24(c)(1). The HCFA Guidelines do not state that an individual can only be a "threat to him/herself or others" if he is suicidal or homicidal.[2] One can imagine many situations in which an individual with a psychiatric impairment poses a "threat" to others without being suicidal or homicidal. Such an individual might cause great destruction without intending to do so, simply because he or she is not aware of or cannot control his or her own actions.

The cases cited by the Hospital are inapposite. In *Green v. Touro Infirmary*, 992 F.2d 537, (5th Cir. 1993), the Fifth Circuit affirmed summary judgment for the hospital only because the plaintiff had presented no evidence in contradiction to the defendant infirmary's position; not, as the Hospital here suggests, simply because the plaintiff had

---

[2] The Guidelines state in relevant part: "For purposes of discharging a patient (other than for the purpose of transfer from one facility to a second facility), for psychiatric conditions, the patient is considered to be stable when he/she is no longer considered to be a threat to him/herself or to others." § 489.24(c)(1).

no signs or symptoms of acute distress. *Green*, 992 F.2d at 539-40. The Hospital also relies on *Cleland v. Bronson Healthcare Group, Inc.*, 917 F.2d 266 (6th Cir. 1990). In *Cleland*, the Sixth Circuit affirmed a grant of summary judgment for the defendant health care institution, but only because the plaintiff's "failure to stabilize" claim was based solely on a negative outcome; there was no evidence indicating that the patient was unstable at discharge. *Cleland*, 917 F.2d at 269. Tellingly, the court specifically stated that there was no allegation of "any facts known to the doctors *at the time* to state that the patient was not stabilized." *Id.* (emphasis added). Such is not the case here. Kemp's testimony renders this case distinguishable from both *Green* and *Cleland*, in that in this case there *is* evidence of facts known and recognized by the Hospital staff *at the time of discharge* indicating that the patient may very well have been unstable.

Here, we believe a number of important questions of fact remain to be decided beyond the question of whether Chyrl's status at discharge; for example, whether steroid-induced psychosis can be adequately addressed simply by directing the patient to immediately cease taking the steroid, the extent of the efforts, if any, that were made by the hospital in an effort to transfer Chyrl to a psychiatric hospital, and whether the hospital's actions (or lack thereof) were causally related to Chyrl's death. We are not inferring what the outcome of the case will be; we are simply raising only a few of the important questions—there may be others—that must be decided before one can find that there are no genuine issues of material fact remaining.

## III.  CONCLUSION

Thus, there is a dispute of material fact over whether Chyrl was stabilized at the time of her discharge. Construing the testimony in the light most favorable to the nonmovant, this conflicting testimony alone creates a genuine issue of material fact as to whether Chyrl was a threat to herself or to her husband, and hence whether she had been "stabilized" under the EMTALA.

We hold that the district court's decision to grant summary judgment was not proper. The district court's order is REVERSED and ordered REMANDED to the district court for further proceedings consistent with this opinion.

A true Copy:

      Teste:

                      _____

                      *Clerk of the United States Court of Appeals for the Seventh Circuit*