Larry O'Neil THOMAS, as Administrator of the Estate of James "Milford" Gray, Deceased, and All Lawful Survivors of James "Milford" Gray, Deceased, Appellants,

v.

ST. JOSEPH HEALTHCARE, INC., d/b/a St. Joseph Hospital, Appellee.

and

Saint Joseph Healthcare, Inc., Cross–Appellant,

v.

Larry O'Neil Thomas, as Administrator of the Estate of James "Milford" Gray, Deceased, and All Lawful Survivors of James "Milford" Gray, Deceased, Cross–Appellees.

Nos. 2007–CA–001192–MR, 2007–CA–001244–MR.

Court of Appeals of Kentucky.

July 16, 2010.

Discretionary Review Denied by Supreme Court April 13, 2011.

Elizabeth R. Seif, Lexington, KY, for appellant.

Robert F. Duncan, Jay E. Ingle, K. Brad Oakley, Lexington, KY, for appellee.

Before CLAYTON, DIXON, and WINE, Judges.

## OPINION

WINE, Judge:

In our prior opinion, we set out the facts of this case as follows: The parties vigorously disagree about the facts of this case. However, they agree that James Milford Gray, age 39, arrived at the emergency room of St. Joseph Hospital ("the Hospital") on April 8, 1999, at 8:08 p.m. He was complaining of abdominal pain, constipation for four days, nausea and vomiting. He was seen by physician's assistant Julia Adkins and Dr. Barry Parsley. He received medication for pain and later received an enema and manual disimpaction of his colon. Although lab tests were ordered, either Gray refused to cooperate, or upon reorder, they were never conducted. Likewise, no x-rays were conducted.

Gray was discharged at 12:40 a.m. on April 9, 1999. He was taken by ambulance to the homes of different family members with whom he had previously stayed. However, no family member agreed to provide a place to stay, so he was returned to the Hospital. Upon his return to the emergency room, the Hospital made arrangements for Gray to stay at the nearby Kentucky Inn.

Gray returned to the Hospital at 5:25 a.m. after the staff of the Kentucky Inn contacted 911 on his behalf. He had been vomiting dried blood for several hours. He was again seen and evaluated by both Adkins and Dr. Parsley. Lab tests and x-rays were conducted during this visit. Subsequently, he was discharged by Dr. Jack Geren at 12:15 p.m.

However, Gray died later that day at a family member's home. The autopsy report listed the cause of death as purulent peritonitis caused by a rupture of a duodenal ulcer due to duodenal peptic ulcer disease. The autopsy report also listed constrictive atherosclerotic coronary artery disease as a contributory cause of Gray's death.

Gray's Estate ("the Estate") brought this action on April 8, 2000, alleging medical negligence against the Hospital, Dr. Joseph Richardson (a physician who treated Gray during an earlier visit to the Hospital on March 9, 1999), Dr. Parsley, Dr. Geren, physician's assistant Adkins, and several members of the nursing staff. In addition, the Estate alleged that the Hospital violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"). After a lengthy period of discovery,

the matter proceeded to trial on October 3, 2005. However, that trial ended in a mistrial.

Prior to the second trial, the Estate settled with Drs. Richardson, Parsley, and Geren. The matter then proceeded to a jury trial on the claims against the Hospital on November 7–9, 14–17, and 21–23, 2005. The jury returned verdicts for the Estate on both the medical negligence and the EMTALA claims. The jury apportioned fault as follows: 15% to the Hospital; 0% to Dr. Richardson; 30% to Dr. Parsley and physician's assistant Adkins; 30% to Dr. Geren; and 25% comparative fault to Gray. The jury awarded compensatory damages of $25,000.00, of which the Hospital's share was $3,750.00. The jury also assessed punitive damages against the Hospital in the amount of $1,500,000.00.

Thereafter, the Hospital filed motions for a judgment notwithstanding the verdict and for a new trial. The trial court denied the motions with respect to the jury's findings of liability and the award of compensatory damages. However, the court concluded that the award of punitive damages was clearly excessive and therefore a new trial on that issue was in order.

### Procedural History

The Hospital and the Estate each filed an appeal from the trial court's order. In its cross-appeal, the Hospital argued that it was entitled to a directed verdict on the Estate's EMTALA and negligence claims, that the Estate's claim for unliquidated damages should have been dismissed because it failed to disclose the amount of such damages it was seeking, and that it was entitled to a new trial based upon the Estate's misconduct at trial and other trial errors. The Hospital also argued that the issue of punitive damages should not have

been submitted to the jury, or in the alternative, that the jury instructions regarding punitive damages were inadequate. In its direct appeal, the Estate argued that the award of punitive damages was not excessive and therefore the Hospital was not entitled to a new trial on this issue.

This Court affirmed the trial court in part, reversed in part, and remanded for a new trial on the issue of punitive damages.[1] This Court found that the EMTALA and negligence issues were properly presented to the jury with proper instructions. We also found that the Estate sufficiently supplemented its response regarding unliquidated damages following the first trial, and we concluded that the Hospital was not entitled to a new trial. This Court further found that the trial court properly set aside the punitive damages award as excessive. However, we further concluded that the instructions on punitive damages were deficient. We directed that the punitive damages instructions on remand must set out the standard of proof and require proof that the Hospital ratified the employee's conduct.

The Hospital and the Estate each filed motions for discretionary review. The Kentucky Supreme Court granted the Hospital's motion. Thereafter, the Supreme Court remanded the action to this Court for reconsideration in light of its recent opinion in *Martin v. Ohio County Hospital Corp.*, 295 S.W.3d 104 (Ky.2009). On remand, the parties submitted supplemental briefs addressing the applicability of *Martin.*

### Facts and Analysis of EMTALA Claim in Martin v. Ohio County Hospital Corp.

In *Martin*, the Supreme Court addressed, among other things, the proof

---

1. *Thomas, et al. v. St. Joseph Healthcare, Inc.,* Nos. 2007–CA–001192–MR & 2007–CA–001244–MR (Ky.App.2008).

necessary to establish a claim under EMTALA. In that case, the decedent, Billie Carol Shreve, was taken to the hospital after an automobile accident. She was first evaluated in the hospital's emergency room by a registered nurse, who performed triage. Shreve had indications of blunt abdominal trauma and stated that she was uncomfortable, and although she otherwise appeared stable at first, rapidly deteriorated. Her blood pressure began to drop severely and her pulse rate elevated approximately an hour and twenty-five minutes after arriving at the hospital, and she lapsed into unconsciousness some nine minutes later.

The nurse and physician attending her testified that by that time, they believed she had gone into shock, was probably hemorrhaging, and was in need of a surgeon. However, there was no surgeon available to the hospital, or one was not called. The attending physician could not pinpoint the source of bleeding, but ordered blood transfusions. The physician ordered a CT scan, but had to forward the films to another hospital to have a radiologist read them. However, Shreve was not transferred to another hospital for more than four hours. By the time she arrived, the patient had bled to death.

Shreve's estate brought an action against the doctor and the hospital, asserting claims for medical malpractice and violation of EMTALA. In particular, the estate alleged that the hospital had violated its duties under EMTALA to provide an appropriate medical screening and to stabilize Shreve's condition before discharging her and transferring her to another facility. At the conclusion of trial, the jury found for the estate on both the negligence and EMTALA claims.

On appeal, the hospital argued that it was entitled to a directed verdict on the EMTALA claim because there was no evidence that it provided disparate treatment to Shreve based on her ability to pay. This Court concluded that, while improper motive is not a necessary element to prove a failure-to-stabilize claim under EMTALA, it is an element required to prove that the hospital violated its duty to provide an adequate medical screening. *Ohio County Hospital Corp. v. Martin,* No. 2006–CA–002248–MR (Ky.App.2008), slip op. at 9, citing *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266 (6th Cir.1990). This Court further found no evidence that the hospital failed to comply with EMTALA before transferring Shreve. Consequently, this Court concluded that the hospital was entitled to a directed verdict on both aspects of the EMTALA claim. *Id.* at 10–11.

The Kentucky Supreme Court agreed that the hospital was entitled to a directed verdict on the EMTALA claims, but on significantly different grounds. The Court first questioned whether EMTALA applied because there was no evidence that the hospital or the doctor made treatment decisions based on Shreve's ability to pay. The Court went on to hold that motive is not an element of a screening or a stabilization/transfer claim under EMTALA.

Rather, the Court concluded that EMTALA imposes specific duties on medical providers, and imposes strict liability on the provider for violation of those duties regardless of motive.

The screening requirement provides that, if a hospital at which an individual seeks "examination or treatment" has an emergency room, the hospital *must* provide "an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department...." The purpose of providing such screening is "to determine whether or not an emergency medical condition ... exists."

[42 U.S.C.] § 1395dd(a). The hospital must do enough screening or diagnostics to make that determination. If there is no emergency, this Act does not apply. If the hospital determines that an emergency medical condition exists, then the stabilization-or-transfer requirement kicks in. This requires the hospital to provide additional medical examination and treatment within its capabilities or to transfer the person to an appropriate facility. In reality, the medical emergency may require some treatment, if within the hospital's capability, before transfer, which is arguably what happened here.

However, subsection (c) of EMTALA places three alternative requirements on the hospital, only one of which must be met, before it may transfer a patient: that it get a request to transfer in writing from the patient; that a physician sign a certification that the treatment reasonably expected to be received at the other hospital outweighs the risks of transfer; and that if no physician is physically present, qualified medical personnel as defined in the statute may sign the risk certification if a physician has in fact made the determination and later adopts it by signing it. § 1395dd(c).

*Martin, supra* at 113.

Turning to the facts of the case before it, the Supreme Court in *Martin* concluded that the hospital had satisfied its duties under EMTALA. Although the Court recognized that there was a question whether the doctor and the hospital staff performed these actions within the appropriate standard of care, the Court concluded that the hospital had met its duties under EMTALA. Consequently, the Supreme Court determined that the hospital was entitled to a directed verdict on the EMTALA issues of screening and stabilization or transfer because all the requirements of the statute were met.

The Supreme Court then went on to discuss the proof necessary to establish an EMTALA claim, the appropriate jury instructions, and the damages available for a violation of EMTALA.

This Court does not believe that improper motive is an element of the individual EMTALA claim. If a hospital complies with the statute, motive is obviously immaterial. But it is also immaterial when it does not comply, because regardless of motive, the hospital has failed in its statutory duty, and is thus liable. If there is no dispute that the hospital did or did not do what the statute requires, then the personal cause of action is to determine damages only. But this Court does recognize that there could be a dispute over whether the hospital has done the necessary things, such as a scenario where a physician testifies that he completed and signed the Certificate of Transfer, but it cannot now be found in the record. Such questions of fact would also obviously be determined at trial.

To that end, a general negligence instruction is not appropriate in an EMTALA claim. The statute puts an absolute duty on hospitals to do what it requires. Thus, appropriate instructions (if there is a liability question, and assuming that the hospital has an emergency department) would be as follows.

If an emergency medical condition has not been determined, such as when a patient is allegedly improperly screened:

It was the duty of defendant hospital to provide an appropriate medical screening examination of the plaintiff (decedent) within the capability of the hospital's emergency department whether or not a medical emergency exists.

Do you believe, based on the evidence, that the hospital provided such screening?

Yes ____ No ____

For instance, this instruction would apply when a patient was released without further examination, stabilization or transfer on a determination that there was no emergency medical condition, then later has problems or dies.

If the hospital has determined that the individual has an emergency medical condition:

It was the duty of the hospital, because there was an emergency medical condition, to

A) provide such medical examination and treatment necessary to stabilize the medical condition within the staff and facilities available; or

B) to transfer the plaintiff (decedent) to another medical facility by

1) obtaining informed consent from the plaintiff (decedent) in writing; or

2) issuing and signing a Certificate of Transfer certifying that the medical benefits reasonably expected from the transfer outweigh any increased risks to the individual from transfer; or

3) allowing a qualified medical person to issue the Certificate of Transfer after a physician has made the actual certification, and subsequently signs the certificate.

Do you believe, based on the evidence, that the hospital performed its duty in regard to the plaintiff (decedent)?

Yes ____ No ____

This instruction should be given if a determination that there is an emergency medical condition has been made. After such determination, the screening requirements obviously have no application because regardless of their efficacy, the proper deter-mination has been made that requires further examination and treatment within the hospital's capabilities, or transfer to an appropriate facility.

There will be necessary variations depending on the facts of each case, and whether there is a liability question or a damages claim only. Since the damages allowed to the individual by the statute are those "available for personal injury under the law of the State in which the hospital is located," § 1395dd(d)(2)(A), the general damages instruction will apply. But it must be emphasized that such damages are available under EMTALA only when the personal harm is a direct result of the hospital's violation of the statute, not by any harm caused by the medical negligence of personnel or the hospital.

*Id.* at 113–15.

But while the Court in *Martin* concluded that the hospital was entitled to a directed verdict on the EMTALA claims, it did not remand the matter for a new trial. The Court noted that the jury was separately instructed on all of the estate's theories of liability, and that the proof of damages was the same for each of the theories. Since the jury found for the estate on the other theories of liability, the Court determined that a new trial was not necessary to sustain the judgment. *Id.* at 116.

### Application of **Martin** *Analysis to Current Case*

In the current case, the Estate argues that the factual and legal issues in *Martin* were so different that its application to the current case is limited. The Estate correctly notes that the screening requirement of § 1395dd(a) is not at issue. In *Martin*, the hospital met all the requirements of EMTALA to transfer Shreve. By contrast, the Estate notes that the Hospital did not attempt to transfer Gray.

Rather, the Estate argues that the Hospital failed to stabilize Gray's emergency medical condition prior to discharging him.

The Hospital, on the other hand, maintains that it met its duties under EMTALA as set out in *Martin*. The Hospital provided medical treatment to Gray both times he was admitted. Even if the treatment was inadequate or negligent, the Hospital argues that it was sufficient to meet its duties under EMTALA. And the Hospital again argues that it cannot be liable under EMTALA for failing to detect Gray's duodenal ulcer, but only for failing to stabilize and treat the emergency medical conditions which it actually detected. The Hospital notes that its physicians diagnosed Gray with "acute gastritis, with hemorrhage," and he was treated for this condition. The Hospital also points to Dr. Geren's conclusion that Gray was stable at the time of his discharge. Thus, the Hospital contends that EMTALA is not applicable, but that the facts of this case would more appropriately support a negligence claim.

■ As we noted in our prior opinion, the Hospital does not violate its duty to stabilize under EMTALA if it fails to detect or if it misdiagnoses an emergency condition. *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993–94 (9th Cir.2001). However, the duty to stabilize under EMTALA requires the Hospital "to provide such medical treatment of the [emergency medical] condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility...." 42 U.S.C. § 1395dd(e)(3)(A). The term "emergency medical condition" means,

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual ... in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part ...

42 U.S.C. § 1395dd(e)(1)(A).

■ Based on these definitions, the Hospital's duty to stabilize under EMTALA arises upon its determination that the patient is manifesting symptoms of sufficient severity as to constitute an "emergency medical condition". Although the Hospital is not liable when it fails to detect or misdiagnoses an emergency condition, it must stabilize the emergency medical condition which it actually detects prior to discharging the patient. In assessing the physical stability of a patient, courts have generally focused on the EMTALA requirement that "no material deterioration" of the condition is likely. *Thomas v. Christ Hospital and Medical Center*, 328 F.3d 890, 893 (7th Cir.2003), citing *St. Anthony Hospital v. U.S. Dept. of Health and Human Services*, 309 F.3d 680, 697 (10th Cir.2002); *Harry v. Marchant*, 291 F.3d 767, 771 (11th Cir.2002); *Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1167 (9th Cir.2002).

In *Cleland v. Bronson Health Care Group, supra*, and *Vickers v. Nash General Hospital, Inc.*, 78 F.3d 139 (4th Cir. 1996), the respective hospitals' failures to diagnose potentially life-threatening conditions were arguably negligent.[2] Neverthe-

**2.** In *Cleland*, the hospital diagnosed that patient's severe intestinal damage as influenza. However, the condition appeared to be stable upon discharge. Similarly in *Vickers*, the hos- pital treated the patient's scalp laceration and contusions, but failed to discover cerebral

less, the courts in both cases dismissed the EMTALA claims, noting that neither hospital had reason to know that the patients' conditions were not stable, that the conditions were worsening in any way, or that the conditions presented any risk that might become life-threatening. *Cleland,* 917 F.2d at 271; *Vickers,* 78 F.3d at 145.

■ In this case, the Hospital's misdiagnosis of Gray's condition would be negligent. However, the Hospital's own records also show that Gray was in severe pain, was vomiting blood, and had above-normal respiratory rate, highly elevated white-cell count, below-normal red-cell count, below-normal lymph percentage, increased hematocrit, and below-normal urine output and density. Furthermore, there was evidence that he was still in distress at the time of his discharge. Finally, the Estate's EMTALA claim was not based only on the actions of the Hospital's physicians, but also on the actions of the Hospital's nursing staff who failed to properly record and advise the physicians about the extent of Gray's distress. There was evidence that the Hospital staff told Gray or his family that they would call the police if Gray continued to return. Thus, a jury could find that the Hospital did not meet its stabilization duties under EMTALA notwithstanding Dr. Geren's determination that Gray was stable at the time of his discharge. Therefore, we conclude that the Hospital was not entitled to a directed verdict on the EMTALA claim even in light of the analysis in *Martin.*

■ The Hospital also points to the language in *Martin* which emphasized that damages are available under EMTALA only when the personal harm is the direct result of the hospital's violation of the statute, not by any harm caused by the medical negligence of personnel or the hospital. *Martin, supra,* at 114–15. We disagree

with the Hospital's argument interpreting this language to mean that claims under EMTALA and medical negligence are mutually exclusive. The Court in *Martin* noted that proof of damages was the same under all of the plaintiff's theories. Since the Court found that the hospital had met its duties under EMTALA, the Court concluded the estate's damages sounded only in negligence. *Id.* at 115.

Nevertheless, a failure to provide stabilization of an emergency medical condition may amount to a violation of EMTALA and medical negligence. *See Cleland, supra,* at 270 (6th Cir.1990). To a certain extent, the damages may overlap. Ideally, the instructions should require the jury to set out which damages are attributable to the EMTALA violation and which damages are attributable to the medical negligence claim. Likewise, the Hospital may have been entitled to somewhat different instructions on the EMTALA claim based upon the analysis in *Martin.* However, the Hospital has not requested a new trial, only a finding that it was entitled to a directed verdict on the EMTALA claims. Since we have found that the Hospital was not entitled to a directed verdict on the EMTALA claims in light of *Martin,* we need not address additional remedies which the Hospital has not requested.

Since we conclude that the Supreme Court's opinion does not affect the Estate's judgment and award of compensatory damages on the EMTALA claim, we need not address the other issues raised in our prior opinion. Rather, we will simply adopt those portions of our prior opinion relating to the trial issues, the award of unliquidated damages, and the award of punitive damages. We also restate our prior conclusion that this matter must be remanded for a new trial on punitive damages.

herniation and epidural hematoma that

caused his death four days after discharge.

Accordingly, the judgment of the Fayette Circuit Court is affirmed in all respects except for the award of punitive damages. While we affirm the trial court's order granting a new trial on the issue of punitive damages, we also find that the Hospital was entitled to instructions properly setting out the law as to ratification and the standard of proof. Therefore, we remand this matter for a new trial in accord with this Court's prior opinion.

ALL CONCUR.